**Meredith Yates**
P.O. Box 528
Marble, NC 28905
(828) 361-7245
September 29, 2025

**Clerk of Court**
U.S. District Court
Western District of North Carolina
Asheville Division
100 Otis Street, Room 309
Asheville, NC 28801

Re: *Yates & Vanover v. Smith, et al.* — Initial Complaint and Jury Demand

Dear Clerk of Court:

Enclosed please find the following for filing in the above-referenced matter:

1. Original Complaint with Exhibit List and attached Exhibits A–F;

2. Civil Cover Sheet (JS-44);

3. Summons forms for each named Defendant; and

4. Copies of the Complaint for service.

Please file the enclosed documents and issue summonses for each Defendant. I respectfully request that one file-stamped copy of the Complaint be returned to me in the enclosed self-addressed, stamped envelope for my records.

Thank you for your assistance.

Respectfully,

*Meredith Yates*
/s/ Meredith-Ann Yates
Meredith-Ann Yates
Plaintiff, Pro Se

/s/ Kevin-Wayne Vanover
Kevin-Wayne Vanover
Plaintiff, Pro Se

enclosed money order for $405.00     number 27076173164

# UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

**MEREDITH-ANN YATES**
c/o P.O. Box 528
Marble, NC 28905

and

**KEVIN-WAYNE VANOVER**
c/o P.O. Box 528
Marble, NC 28905

**Plaintiffs,**

v.

**DUSTIN SMITH**, Sheriff of Cherokee County, in his individual and official capacities;

**MITCHELL "MITCH" MORGAN**, Lieutenant, CCSO, in his individual and official capacities;

**JUSTIN JACOBS**, Chief Deputy, CCSO, in his individual and official capacities;

**SPORT TEASDALE**, Detective (ret.), CCSO, in his individual and official capacities;

**THOMAS J. ARNOLD**, Chief Assistant District Attorney, in his individual capacity;

**ASHLEY H. WELCH**, District Attorney, in her individual capacity;

**ROGER D. GIBSON**, Clerk of Superior Court (ret.), in his individual capacity;

**AMANDA A. CARROLL**, appointed Clerk of Superior Court, in her individual capacity;

**THERESA CREASMAN**, Cherokee County 911 Manager, in her individual capacity;

**JENNY WHITESIDE**, United States Probation Officer, in her individual capacity;

**BETTY WEBB**, individual;

**JENNIFER VANOVER ("J. VANOVER")**, individual;

**KENNY WEBB**, individual;

**ROBERT LOVINGOOD**, individual;

**RHONDA LOVINGOOD**, individual;

**KIM KLINDERA**, individual;

**ZEYLAND MCKINNEY**, individual;

**DEPUTY BURRELL**, individual;

**DEPUTY DELY**, individual;

**DEPUTY HUNTER WOOD**, individual;

**JOHN/JANE DOE DEPUTIES AND CLERKS OF CHEROKEE COUNTY**, in their individual capacities,

**Defendants.**

Case No. _____

**COMPLAINT AND JURY DEMAND**

---

# I. JURISDICTION AND VENUE

1. This action arises under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983, 1985, and 1986. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343.

2. Diversity jurisdiction also exists under 28 U.S.C. § 1332, as Plaintiffs are citizens of North Carolina and certain Defendants, including Webb and J. Vanover, are citizens of Tennessee. The amount in controversy exceeds $75,000.

3. This Court also has supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal claims. Plaintiffs assert their due process claims under the Fourteenth Amendment to the United States Constitution as to state and county officials, and under the Fifth Amendment to the United States Constitution as to federal officials, including U.S. Probation Officer Whiteside and federal agents acting under color of federal authority.

4. Venue lies in this Court under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to these claims occurred in Cherokee County, North Carolina, within the Asheville Division.

## II. PARTIES

5. Plaintiff **Meredith-Ann Yates** is a resident and citizen of North Carolina.

6. Plaintiff **Kevin-Wayne Vanover** is Yates's husband and a resident and citizen of North Carolina.

7. Defendant **Dustin Smith** is the elected Sheriff of Cherokee County, North Carolina. He is sued in his individual capacity and in his official capacity as Sheriff, as final policymaker for the Cherokee County Sheriff's Office.

8. Defendant **Mitchell "Mitch" Morgan** is a Lieutenant with the Cherokee County Sheriff's Office. He is sued in his individual and official capacities.

9. Defendant **Justin Jacobs** is the Chief Deputy of the Cherokee County Sheriff's Office. He is sued in his individual and official capacities.

10. Defendant **Sport Teasdale** is a retired Detective with the Cherokee County Sheriff's Office. He is sued in his individual and official capacities.

11. Defendant **Thomas J. Arnold** is the Chief Assistant District Attorney for the 43rd Prosecutorial District. He is sued in his individual capacity.

12. Defendant **Ashley H. Welch** is the elected District Attorney for the 43rd Prosecutorial District. She is sued in her individual capacity.

13. Defendant **Roger D. Gibson** was the elected Clerk of Superior Court for Cherokee County. He is sued in his individual capacity.

14. Defendant **Amanda A. Carroll** was appointed Clerk of Superior Court for Cherokee County following Gibson's retirement. She is sued in her individual capacity.

15. Defendant **Theresa Creasman** is the Cherokee County 911 Manager. She is sued in her individual capacity.

16. Defendant **Jenny Whiteside** is a United States Probation Officer. She is sued in her individual capacity.

17. Defendant **Betty Webb** is a private individual and a citizen of Tennessee.

18. Defendant **Jennifer Vanover ("J. Vanover")** is a private individual and a citizen of Tennessee.

19. Defendant **Kenny Webb** is a private individual and a citizen of Tennessee.

20. Defendant **Robert Lovingood** is a private individual and a citizen of North Carolina.

21. Defendant **Rhonda Lovingood** is a private individual and a citizen of North Carolina.

22. Defendant **Kim Klindera** is a private individual and a citizen of North Carolina.

23. Defendants **John/Jane Doe Deputies and Clerks of Cherokee County** are individuals whose identities are presently unknown who participated in or facilitated the misconduct alleged herein. They are sued in their individual capacities.

    **23A. Defendant Zeyland McKinney** is an attorney licensed in North Carolina who represented Defendants Robert and Rhonda Lovingood in civil proceedings against Plaintiffs. He is sued in his individual capacity for acts taken outside the scope of litigation privilege and in furtherance of the conspiracies described herein, including permitting false sworn statements to stand despite exculpatory evidence, attempting to intimidate Plaintiff Yates with false accusations of criminal conduct, and spreading disparaging claims about Plaintiff Vanover to third parties.

    23B. **Defendant Deputy Burrell** is a deputy with the Cherokee County Sheriff's Office. He is sued in his individual capacity for acts described herein, including participation in the unlawful arrest of Plaintiff Yates on July 11, 2024.

23C. **Defendant Deputy Dely** is a deputy with the Cherokee County Sheriff's Office. He is sued in his individual capacity for acts described herein, including participation in the unlawful arrest of Plaintiff Yates on August 12, 2024.

23D. **Defendant Deputy Hunter Wood** is a deputy with the Cherokee County Sheriff's Office. He is sued in his individual capacity for acts described herein, including declarations that Plaintiffs' property was "abandoned" and other misconduct alleged herein.

## III. STATEMENT OF THE CASE

This civil-rights action arises from a coordinated pattern of fraud, retaliation, and denial of due process that stripped Plaintiffs of their home, property, and constitutional protections. Rather than use the law to safeguard rights, county officials and private actors wielded it to exclude, punish, and plunder—while institutions responsible for accountability looked away.

In 2015, Plaintiff Meredith-Ann Yates purchased 301 Sunny Lane / 37 Shady Creek Ridge in Cherokee County, North Carolina by recorded warranty deed. While Yates was incarcerated in

2019, Defendant Betty Webb exploited that vulnerability to pressure Yates into signing a "temporary" deed to Webb and Defendant J. Vanover. The deed recited only ten dollars ($10.00) in consideration; Webb falsely claimed she was merely "adding Jennifer" for insurance and promised the property would be returned. Instead, Defendants recorded a full transfer and, by 2025, Webb listed the property for approximately $450,000.

On the day of Yates's release in January 2020, she returned to find the residence destroyed by fire. On information and belief, Webb admitted responsibility for the fire. The insurer and fire department assessed the blaze as arson. Webb then proposed staging a break-in and filing a false police report; Yates refused. Despite this devastation, after his own release in November 2020, Plaintiff Kevin-Wayne Vanover demolished the remains and rebuilt the home largely by himself, using licensed electrical and plumbing subcontractors. The fair-market value of Vanover's labor and improvements is approximately $146,800.

Events escalated in 2023–2024. On July 31, 2023, at a no-contact order hearing brought by Robert and Rhonda Lovingood, the presiding judge stated on the record that he had met privately with Chief Deputy Justin Jacobs immediately before the hearing. When Plaintiffs later obtained the "certified" courtroom audio, it contained a 26-minute gap that omitted that disclosure (see Exhibit F). At that same hearing, Defendant Betty Webb testified under oath in open court that she would sign the property back over to Plaintiffs. False sworn statements were entertained; Plaintiffs' exculpatory police reports were refused; and a double-digit number of deputies filled the courtroom, intimidating Vanover and tainting the process.

On May 21, 2024, U.S. Probation under Defendant Jenny Whiteside, assisted by ATF agents and CCSO deputies, raided Plaintiffs' home with approximately twenty-one agents; Vanover was taken into federal custody that day. That same day, Webb's attorney dated a letter describing Plaintiffs as mere "guests." On June 24, 2024—Vanover's birthday—Webb obtained a trespass warrant alleging conduct on May 20, though Vanover had been in federal custody beginning May 21. On July 11, 2024, Yates was arrested for trespass after being lured to the Sheriff's Office under the pretense of receiving "civil papers." On August 12, 2024, Yates was arrested again based solely on a short video clip supplied by Webb. Both trespass cases were dismissed in 2025, but by then Yates had incurred approximately $3,000 in legal fees and endured nearly two months of homelessness while barred from her own property.

During Plaintiffs' exclusion, Webb, J. Vanover, and Kenny Webb repeatedly entered the property and removed Plaintiffs' belongings under a pretext of "abandonment." The property taken included vehicles, tools, heirlooms, furniture, equipment, and other effects with an aggregate fair-market value exceeding $750,000. Plaintiffs possess photographs and video documenting Kenny Webb's participation.

When Plaintiffs sought protection, the Sheriff's Office refused to take theft reports, denied deputy escorts, and ignored Vanover's explicit refusal of consent from custody. In emails, Chief Deputy Jacobs wrote that he was "removing hospitality" toward Plaintiffs and told Yates to "hire a private attorney." The District Attorney's Office declared the matter "civil only." The State Bureau of Investigation stated it acts only on referral from those same officials—none was

made. The Clerk's Office returned filings without stamps and produced defective "certified" recordings. Meanwhile, Defendant Whiteside gave false and hostile testimony, threatened Vanover in recorded communications, aligned with Webb's narrative, and federal prosecutors leveraged an 18 U.S.C. § 922(o) charge predicated on an inoperable component to coerce a plea, including threats of additional indictments against Yates.

Defendants then defamed Plaintiffs to destroy their credibility in the community. In August 2025, Webb told community members that Plaintiffs were "doing meth and cocaine" and had "emptied the house." These statements were false and malicious (see Exhibit D).

This misconduct is part of a broader pattern in Cherokee County. In December 2022, a fabricated "hostage" narrative led to the shooting of Jason Kloepfer in his own home while his hands were raised. A subsequent federal civil-rights action resulted in a $10 million settlement shared by Cherokee County and the Eastern Band of Cherokee Indians. In 2025, the District Attorney issued a Giglio determination deeming Lt. Milton "Sport" Teasdale untruthful regarding the Kloepfer raid, yet leadership tolerated his role. County institutions have also been exposed for evidence-room irregularities (missing firearms and cash), unlawful removals of children by DSS leadership (followed by obstruction convictions), clerk-office record defects, and systemic favoritism and retaliation against citizens who seek protection or accountability. Against this backdrop, Plaintiffs' repeated complaints and whistleblowing—including on sensitive matters—were met with hostility, not help.

Plaintiffs exhausted every available avenue. Between 2023 and 2025, they submitted more than 200 complaints or requests for intervention to federal and state agencies, elected officials, watchdogs, and media. At least 116 were ignored and 84 were deflected as "civil only" or "outside our jurisdiction." With local and state remedies unavailable or futile, Plaintiffs seek declaratory, injunctive, and monetary relief in this Court to vindicate their constitutional rights and to prevent further harm.

Good-Faith Filing. Plaintiffs recognize the Court's duty to guard against frivolous litigation. This action is not brought for an improper purpose. Each allegation is grounded in verified facts, sworn testimony, or documentary evidence, and is brought in good faith under Rule 11. Far from being frivolous, the misconduct described above reflects serious, substantiated deprivations of constitutional rights.

## IV. FACTUAL ALLEGATIONS

### A. Property Purchase and Fraudulent Transfer

24. In 2015, Plaintiff **Meredith-Ann Yates** fulfilled the American dream of homeownership when she purchased **301 Sunny Lane / 37 Shady Creek Ridge** in Cherokee County, North Carolina, by recorded warranty deed (Book 1511, Pages 235–237, Instrument 01674) (see Exhibit A).

25. Yates purchased the property by valid contract with the Hamons. There was never any purchase contract between Yates and Defendants **Betty Webb** or **J. Vanover**. They had no lawful entitlement to this property.

26. In August 2019, while Yates was incarcerated, Defendant Webb exploited that vulnerability to pressure Yates into signing a deed transferring the property to Webb and J. Vanover.

27. The 2019 deed recited only ten dollars ($10.00) in consideration and was recorded at Book 1619, Pages 881–883, Instrument 03515 (see Exhibit B).

28. Yates's Power of Attorney did not authorize such a transfer.

29. Webb represented to Yates that she was merely "adding Jennifer" to the deed so that insurance coverage would not lapse and to protect against squatters. Webb promised that the property would be returned once Yates was released.

30. These statements were false. Webb and J. Vanover never intended to return the property. They recorded a full transfer in their own names.

31. The conversations in which Webb made these misrepresentations occurred while Yates was incarcerated in federal custody and were recorded by prison facilities. Plaintiffs will seek these recordings by subpoena. These tapes will corroborate exactly what Webb said — and why Yates, under duress, felt she had no choice but to trust the false promise.

32. Plaintiffs were left in the devastating position of watching strangers — family members acting as predators — seize their home on paper while they were powerless behind bars.

   **B. Fire, Arson, and Rebuild**

33. On the day of Yates's release in January 2020, she returned to find the residence a total loss from fire.

34. On information and belief, Webb admitted responsibility for the fire.

35. Both the insurer and the fire department determined the blaze was arson (see Exhibit I).

36. As Yates sifted through the ruins, she discovered that approximately 90% of the items left on site were not Plaintiffs' belongings, showing that Defendants had already removed or replaced most of their property.

37. Webb then proposed staging a break-in and filing a false police report to claim additional "missing" property.

38. Yates refused to participate in the scheme.

39. After his release in November 2020, Plaintiff Kevin-Wayne Vanover demolished the fire-damaged remains and rebuilt the home largely by himself.

40. Vanover employed licensed subcontractors for electrical and plumbing work.

41. Vanover also received limited help setting roof trusses.

42. Plaintiffs have preserved receipts and invoices documenting this work.

43. Because Webb diverted and kept much of the insurance proceeds, Plaintiffs were forced to use Yates's inheritance to finish the rebuild.

44. The fair-market value of Vanover's labor and improvements is approximately $146,800 (see Exhibit K).

45. Vanover was not paid for this labor. He undertook the rebuild in reliance on Webb's sworn promise that the deed would be corrected, and in the belief that he was restoring his own family's home.

46. Defendants Webb and J. Vanover benefitted from these improvements without providing any compensation.

47. On July 31, 2023, Defendant J. Vanover sent a text message corroborating Webb's sworn promise to return the property (see Exhibit G).

48. Despite that sworn promise and corroborating text, Webb maintained title in her and J. Vanover's names.

49. In 2025, Webb listed the property for approximately $450,000 on the Multiple Listing Service (MLS) (see Exhibit H).

50. The theft was thus complete: Plaintiffs' rightful home, their labor, their inheritance, and their equity were taken, converted into cash on the open market, while every institution charged with protecting them looked the other way.

**C. No-Contact Order Hearing — July 31, 2023**

51. On July 28, 2023, Defendants Robert and Rhonda Lovingood filed a petition for a no-contact order against Plaintiff Kevin-Wayne Vanover.

52. The Lovingoods' sworn statements attached to the petition expressly named Defendant Chief Deputy Justin Jacobs, creating a direct conflict when Jacobs later met privately with the presiding judge.

53. The hearing was held on July 31, 2023, before Judge Roy Wijewickrama.

54. At the outset of the hearing, Judge Wijewickrama disclosed on the record that he had met privately with Jacobs immediately before the proceeding.

55. Because Jacobs was named in the Lovingoods' sworn statements, this private meeting constituted an **ex parte contact** that tainted the integrity of the hearing.

56. When Plaintiffs later obtained the "certified" courtroom audio, the recording contained a **26-minute gap**, from 3:46:50 to 4:13:24 p.m., that omitted this disclosure entirely (see Exhibit F).

57. On **July 30, 2023**, the day before the hearing, Plaintiffs **emailed the court** and attorney **Zeyland McKinney** copies of (a) the **audio recording** of the magistrate incident and (b) **police reports** that contradicted the Lovingoods' allegations (see Exhibit M, police reports and transmittal emails dated July 30, 2023).

58. Those police reports showed the Lovingoods had **changed their story** and that **Vanover was listed as the victim**, not the aggressor (see Exhibit M).

59. Despite these submissions, the court entertained the Lovingoods' **false sworn statements**, including claims "on information and belief" that Vanover had cursed at a magistrate.

60. Plaintiffs' exculpatory **police reports**—submitted in advance—were **refused** and not admitted (see Exhibit M).

61. In reality, when Vanover had previously met with the magistrate, he had not cursed; he suffered a **panic attack**, fell to his knees, and begged for equal treatment under the law.

62. This episode was recorded by Plaintiffs, and **paramedics were summoned**, generating an independent run report (see Exhibit L).

63. Defendant **Betty Webb also testified under oath** in open court that she would sign the property back over to Plaintiffs. This sworn promise was later corroborated in writing by Defendant **J. Vanover**'s text message (see Exhibit G).

64. At the hearing, a **double-digit number of deputies** filled the courtroom—far more than ordinary for such a civil proceeding.

65. The **editor of the local newspaper** later confirmed that the deputy presence was unusual and intimidating (see Exhibit N).

66. Plaintiffs allege that the overbearing presence of armed deputies was intended to intimidate Vanover and **trigger his diagnosed PTSD**.

67. Attorney **Zeyland McKinney**, representing the Lovingoods, had been given access to Plaintiffs' recording of the magistrate incident **before the hearing** but nonetheless permitted his clients to proceed with false testimony.

68. McKinney went further, attempting to intimidate Plaintiff Yates by accusing her of unlawful wiretapping, even though **North Carolina is a one-party consent state**, and the recording was entirely lawful.

69. McKinney also told third party **Harley Kloepfer** that Vanover was "crazy" and instructed Kloepfer to reassure Plaintiffs that they should "not worry about anything."

70. These actions show not advocacy, but **collusion with county officials** to facilitate a predetermined outcome against Plaintiffs.

71. Defendant **Amanda Carroll**, acting as Clerk of Superior Court, later produced the "certified" audio recording that **omitted** the judge's disclosure of his private meeting with Jacobs, compounding the taint of the proceedings.

72. Defendant **Jacobs** himself sent an email to Plaintiffs stating that he was "**removing all hospitality from CCSO**" toward them, further evidencing hostility and bias (see Exhibit S).

73. Defendant **Rhonda Lovingood's personal animus** toward Vanover also colored her sworn statements. Her son, **Seth Morgan**, told Plaintiffs that Rhonda "hated Kevin."

74. Rhonda herself had previously sparred with Vanover on Facebook, where he commented about her "gray hair and wrinkles." On **May 11, 2023**, in a recorded altercation involving Rhonda, Bob Lovingood, and Vanover, Rhonda referenced this insult (see Exhibit O).

75. Plaintiffs allege that Rhonda's hostility motivated her to misuse the no-contact process and to coordinate with Jacobs, Webb, and others in presenting false statements to the court.

### D. Trespass Warrants and Arrests — June–August 2024

76. On June 24, 2024—Plaintiff Vanover's birthday—Defendant **Betty Webb** obtained a trespass warrant against him (see Exhibit E).

77. The warrant alleged trespass "on or about May 20, 2024."

78. This allegation was impossible. On May 21, 2024, federal agents raided Plaintiffs' property, and Vanover was taken into federal custody. He never returned thereafter.

79. At the time of the warrant, Defendant Webb had already testified under oath in open court that she intended to sign the property back over to Plaintiffs, making her trespass accusation not only false but in direct contradiction of her prior sworn statements.

80. On May 21, 2024, the same day federal agents raided the property and took Vanover into custody, Defendant Webb's attorney dated a letter describing Plaintiffs as mere "guests."

81. Plaintiffs did not receive this letter until several days later.

82. Vanover never saw the letter at all, as he was in federal custody beginning May 21, 2024.

83. On July 11, 2024, Plaintiff Yates was lured to the Cherokee County Sheriff's Office under the pretense that there were "civil papers" for her.

84. Instead of civil papers, Yates was arrested for trespass.

85. On that same day, **Deputy Sport Teasdale** told Yates that she could not return to her property—even with a deputy escort—because of the pending trespass charges.

86. This denial was a **post-issuance misuse of process**, leveraging the charges to bar Yates from her own home while Webb and J. Vanover continued to remove property.

87. Yates memorialized this incident in a written statement submitted to the **local court** and the **federal court**, and she also emailed Defendants **Sheriff Dustin Smith** and **Chief Deputy Jacobs** to document the denial of her rights.

88. These statements and emails are preserved (see Exhibit M).

89. On August 12, 2024, Yates was arrested again for trespass.

90. This second arrest was based solely on a short video clip supplied by Webb, showing Yates briefly stepping onto the property.

91. Neither arrest had probable cause. Yates was the lawful purchaser of the property in 2015, and Webb had no valid contract or consideration for her claim of title.

92. Both trespass prosecutions against Yates were ultimately dismissed in 2025 (see Exhibit C).

93. The trespass prosecution against Vanover was also dismissed in 2025 (see Exhibit C).

94. By the time of dismissal, Yates had incurred approximately **$3,000 in legal fees**.

95. Yates was also barred from her home for nearly two months, forcing her into homelessness while Webb and J. Vanover retained possession of the property.

96. Yates has never been permitted to return. Defendants Webb and J. Vanover continue to maintain possession of Plaintiffs' real property and belongings, depriving Plaintiffs of their home, their possessions, and their dignity.

**E. Property Seizure While Charges Were Pending**

97. While Yates was barred from her property under false trespass charges and Vanover remained in federal custody, Defendants **Webb, J. Vanover, and Kenny Webb** repeatedly entered the property.

98. They acted under the false pretense that the property had been "abandoned."

99. During these unlawful entries, Defendants removed Plaintiffs' belongings, including but not limited to vehicles, motorcycles, trailers, tractors, tools, heirlooms, furniture, household goods, commercial equipment, and personal effects.

100.   The aggregate fair-market value of the property taken exceeds **$750,000** (see Exhibit P).

101.   Plaintiffs possess **photographs and videos** documenting Defendant **Kenny Webb's direct participation** in these removals (see Exhibit O).

102.   In a phone call with Plaintiff Yates, Defendant **Deputy Hunter Wood** stated that Plaintiffs' property was considered "abandoned," reflecting CCSO's complicity in permitting the theft (see Exhibit T).

103.   Plaintiffs repeatedly attempted to file theft reports with the Cherokee County Sheriff's Office, but deputies refused to take reports or assign case numbers.

104. Plaintiffs also requested deputy escorts to safeguard their belongings while Yates was excluded and Vanover was in custody. These requests were denied.

105. On July 11, 2024, Deputy **Sport Teasdale** explicitly told Yates that she could not return to the property, even with a deputy escort, because of the pending trespass charges.

106. Yates documented this denial in a written statement submitted to both local and federal court and in emails to Sheriff **Dustin Smith** and Chief Deputy **Justin Jacobs**.

107. Defendant Jacobs himself sent an email to Plaintiffs stating that he was "**removing all hospitality from CCSO**" toward them, evidencing official hostility and deliberate refusal of protection (see Exhibit S).

108. Plaintiffs allege that CCSO's refusal to provide escorts or accept reports was not random neglect but part of a coordinated policy to deprive them of protection and to aid Webb and J. Vanover in seizing Plaintiffs' property.

109. As of this filing, Defendants Webb and J. Vanover maintain possession of all property and belongings taken, and Plaintiffs have never been restored to their home.

**F. Klindera's Storage Agreement, Unpaid Labor, and Retaliation**

110. In 2024, Plaintiff Yates entered into a **verbal agreement** with Defendant **Kim Klindera** to store Plaintiffs' boat and trailer, dump trailer, and commercial mower on Klindera's property, to protect them from being taken by Defendant Webb.

111. Before this agreement, Plaintiffs had already performed extensive **unpaid labor** for Klindera, including mowing, carpentry, automotive and mechanical work, hauling, and moving heavy items.

112. Plaintiffs performed this labor in good faith, expecting no payment, and relying on Klindera as a trusted neighbor.

113. Despite this trust, Klindera later permitted **Webb** to remove Plaintiffs' stored property without notice or consent.

114. After discovering this betrayal, Plaintiffs first sent Klindera a **formal letter** seeking return of the property. When Klindera ignored the letter, Plaintiffs sent an **invoice** for the value of the property taken. Klindera ignored both communications (see Exhibit Q).

115. Plaintiffs subsequently filed **IRS Form 3949-A Information Referrals** reporting suspected fraud by Klindera, as well as by Webb and J. Vanover (see Exhibit R).

116.   Klindera repeatedly appeared in **court alongside Webb and J. Vanover** during the trespass proceedings against Plaintiffs, demonstrating her alignment with them.

117.   These trespass proceedings were postponed multiple times, prolonging Plaintiffs' exclusion from their own property.

118.   On the very day Yates's trespass charges were finally dismissed in 2025, officials seized the opportunity to arrest Vanover during roll call on a purported probation violation.

119.   Plaintiffs allege this violation was **pretextual and retaliatory**, timed to punish them for prevailing in court and to further deprive them of equal access to justice.

120.   Plaintiffs have preserved records of the demand, the invoice, the IRS referrals, and court appearances involving Klindera, all of which corroborate her complicity with Webb and J. Vanover.

121.   Klindera's conduct exemplifies how even neighbors were drawn into the broader conspiracy to dispossess Plaintiffs, exploiting their labor, stripping them of property, and retaliating when they sought protection from the courts.

**G. Sheriff's Office Refusals and Homelessness**

122.   Plaintiffs repeatedly sought protection from the Cherokee County Sheriff's Office ("CCSO") as Webb, J. Vanover, and Kenny Webb continued to enter and strip their property.

123.   Plaintiffs attempted to file **theft reports** for the property that had been unlawfully removed. Deputies refused to take reports or assign case numbers.

124.   Plaintiffs also requested **deputy escorts** so that Yates could safely retrieve belongings while Vanover was in custody. These requests were denied.

125.   On July 11, 2024, Deputy **Sport Teasdale** explicitly told Yates that she could not return to her property—even with an escort—because of the pending trespass charges.

126.   This denial was documented by Yates in a written statement submitted to both **local court** and **federal court**, and in contemporaneous emails to Sheriff **Dustin Smith** and Chief Deputy **Justin Jacobs** (see Exhibit M).

127.   Defendant Jacobs himself confirmed CCSO's hostility by sending an email to Plaintiffs stating that he was "**removing all hospitality from CCSO**" toward them (see Exhibit S).

128.    Jacobs also told Yates directly that if she felt CCSO was not helping her, she should "**hire a private attorney**."

129.    By refusing to accept reports, denying escorts, and issuing hostile communications, CCSO effectively sided with Webb and J. Vanover in their effort to exclude Plaintiffs from their own home and property.

130.    These refusals left Yates **homeless for nearly two months** after her July 11, 2024 arrest, while Webb and J. Vanover remained in possession of her home and belongings.

131.    During this time, Yates endured the humiliation of being displaced, forced to rely on the charity of others while watching her property, livelihood, and sense of safety eroded.

132.    CCSO's actions were not isolated errors but part of a broader custom and practice of denying protection to Plaintiffs, which was later formalized through Jacobs's "removing all hospitality" directive.

133.    Plaintiffs allege that CCSO's refusals directly enabled the theft of their property, exacerbated their homelessness, and demonstrated deliberate indifference to their constitutional rights.

**H. District Attorney's "Civil Only" Position and SBI Refusal — The Closed Loop**

134.    On August 20, 2025, Defendant **Chief Assistant District Attorney Thomas J. Arnold** responded in writing to Plaintiffs' sworn complaints and inventories by declaring the matter "**civil only**."

135.    Defendant **District Attorney Ashley Welch** ratified this decision and took no further action, despite overwhelming evidence of fraud, theft, and perjury.

136.    Plaintiffs allege that Arnold and Welch knew that classifying the matter as "civil only" would prevent Plaintiffs from obtaining any criminal investigation or prosecution, leaving them without recourse.

137.    Just two days earlier, on August 18, 2025, Defendant **Chad Flowers** of the North Carolina State Bureau of Investigation (SBI) informed Plaintiffs by email that the SBI does not accept **citizen complaints** and would act only upon referral from a sheriff, district attorney, judge, attorney general, or governor (see Exhibit V).

138.    No such referral was ever made by Sheriff Smith, District Attorney Welch, or any other official.

139.    As a result, Plaintiffs were trapped in a **closed loop of denial**:

- The Sheriff's Office refused to take reports or provide escorts.

- The District Attorney's Office declared the matter "civil only" and refused to prosecute.

- The SBI refused to act without a referral from those same officials.

140.    This structure ensured that no matter how much evidence Plaintiffs presented, every official channel would point back to another and deny responsibility.

141.    Plaintiffs allege that this was not accidental but reflective of a coordinated effort to insulate Webb, J. Vanover, and their allies from accountability, while stripping Plaintiffs of constitutional protections.

142.    The refusal to prosecute or investigate left Plaintiffs unprotected against continuing thefts and ongoing possession of their home and property by Webb and J. Vanover.

143.    These refusals also emboldened Defendants, signaling that Plaintiffs could be excluded and dispossessed without consequence.

144.    Plaintiffs allege that the actions of Arnold, Welch, and Flowers deprived them of equal protection and due process under the law, closing every avenue of remedy and leaving them no choice but to seek relief in this Court.

### I. Clerk of Court Record Irregularities

145.    Defendant **Roger D. Gibson**, while serving as the elected Clerk of Superior Court for Cherokee County, mishandled Plaintiffs' filings by returning documents without file-stamping them.

146.    These unstamped filings deprived Plaintiffs of an official record of their submissions, impairing their ability to prove claims, file appeals, and demonstrate the sequence of events (see Exhibit W).

147.    Plaintiffs allege that Gibson's conduct was not an isolated clerical error but part of a broader pattern of obstructing Plaintiffs' access to the courts.

148.    After Gibson's retirement, Defendant **Amanda A. Carroll** was appointed Clerk of Superior Court.

149.    Carroll later produced "certified" audio recordings of court proceedings that contained significant omissions.

150.    In particular, the **July 31, 2023 no-contact hearing recording** was paused between **3:46:50 p.m. and 4:13:24 p.m.**, omitting the portion where Judge Wijewickrama

disclosed his private meeting with Defendant Jacobs (see Exhibit F).

151. The missing segment also impaired Plaintiffs' ability to prove that an ex parte meeting had occurred with a party expressly named in the Lovingoods' sworn statements.

152. Plaintiffs allege that Carroll's certification of the defective audio was not merely an administrative mistake but a knowing act that further obstructed their access to justice.

153. Without a complete and reliable record, Plaintiffs were unable to rely on the transcript to support appeals, motions, or federal complaints concerning the July 31, 2023 hearing.

154. These record irregularities deprived Plaintiffs of a fair opportunity to vindicate their rights and further insulated Defendants from accountability.

155. Plaintiffs allege that the actions of Gibson and Carroll violated their constitutional right of access to the courts, compounding the pattern of obstruction and corruption described above.

**J. Whiteside's Misconduct, FBI Complaint, and PTSD Impact**

156. On May 21, 2024, Plaintiff Yates was arrested on federal charges.

157. On the day those charges were dismissed, Defendant **Jenny Whiteside**, acting under color of federal authority as a U.S. Probation Officer, gave **false and hostile testimony** against Plaintiffs.

158. Yates was present in the gallery during this hearing and witnessed Whiteside's perjury firsthand.

159. This testimony was not neutral. Plaintiffs had previously reported to Whiteside that Defendant Webb was attempting to extort them and steal their property.

160. Rather than investigate or intervene, Whiteside aligned herself with Webb's narrative and reinforced it in open court.

161. Plaintiffs recorded multiple phone calls and in-person meetings with Whiteside. In these conversations, Whiteside berated Vanover, raised her voice, and threatened him with coercive consequences.

162. When Plaintiffs informed Whiteside that these conversations were being recorded, she demanded to hear them. When confronted with her own words, she stopped the threatening behavior.

163.    Plaintiffs preserved these recordings and allege that they show a clear pattern of hostility and bias.

164.    Plaintiffs further allege that the **language Whiteside used in her testimony mirrored the phrasing** from Defendant Webb's attorney's letter dated May 21, 2024, which described Plaintiffs as mere "guests."

165.    Because Whiteside repeated this language during her testimony on the day Yates's charges were dismissed, Plaintiffs allege that Whiteside had prior communications with Webb or Webb's representatives.

166.    Plaintiffs will request in discovery the **emails, text messages, notes, or other communications** between Whiteside and Webb that will show this coordination and collusion.

167.    On the day of Whiteside's false testimony, Yates immediately notified the **paralegal for Vanover's attorney**, emailed counsel and the prosecutor, and filed a **complaint with the FBI** (see Exhibit Y).

168.    Plaintiffs later submitted **preservation requests** to U.S. Probation concerning Whiteside's misconduct, but those requests were ignored.

169.    Plaintiffs also submitted **FOIA requests**, which were denied on the basis that U.S. Probation is not subject to the statute (see Exhibit X).

170.    Plaintiffs allege that Whiteside maintained improper communications with Webb and that her testimony and conduct were influenced by those contacts. Discovery will reveal emails, notes, and other records proving this coordination.

171.    Meanwhile, Vanover was prosecuted under **18 U.S.C. § 922(o)** for an incomplete lower receiver that was inoperable — essentially a paperweight. An ATF agent testified that it could not function as a firearm and could not be attached to an upper receiver without machining (see Exhibit AA).

172.    Prosecutors coerced Vanover into pleading guilty by threatening to bring **new indictments against Yates** if he refused. Plaintiffs allege this plea was obtained through retaliation and coercion, not lawful process.

173.    During his confinement, Vanover was shuffled between multiple county jails, denied consistent PTSD treatment, and left powerless to stop Webb, J. Vanover, and Kenny Webb from stripping Plaintiffs' property. These conditions severely exacerbated his PTSD, leaving him traumatized and broken as he watched his family's life dismantled piece by piece.

### K. Retaliation and Defamation — Creasman and Webb

174.    Defendant **Theresa Creasman**, the Cherokee County 911 Manager, threatened Plaintiff Vanover in a recorded phone call, telling him to **stop calling 911 or she would have him arrested** (see Exhibit BB).

175.    This threat was not idle. Creasman had the authority to direct law enforcement responses, and her warning made clear that the emergency system itself was being weaponized against Plaintiffs.

176.    Creasman later interfered with Vanover's attempt to volunteer with the fire department by ensuring that his application was denied (see Exhibit CC).

177.    Plaintiffs allege that Creasman's conduct was retaliation for their repeated use of lawful channels — including 911 — to report threats and property crimes committed by Webb and her allies.

178.    These actions deprived Plaintiffs of access to emergency protection and civic participation, further isolating them and placing them at risk of violence and loss.

179.    In August 2025, Defendant **Betty Webb** defamed Plaintiffs in the community by telling others that Plaintiffs were "**doing meth and cocaine**" and that they had "**emptied the house.**"

180.    These statements were false and malicious. Plaintiffs have never engaged in the conduct alleged.

181.    Webb's statements were made with intent to destroy Plaintiffs' credibility, to paint them as criminals, and to justify the unlawful seizure of their home and belongings.

182.    **Russelene Richmond** has provided a sworn declaration confirming that Webb made these statements (see Exhibit D).

183.    Plaintiffs allege that Webb's false accusations constitute **defamation per se** under North Carolina law, as they imputed the commission of indictable criminal offenses involving moral turpitude, causing reputational harm and humiliation.

### L. Exhaustion of Remedies

184.    Between 2023 and 2025, Plaintiffs submitted more than **200 complaints, referrals, and requests for intervention** to every level of federal and state authority, including the United States Department of Justice, Federal Bureau of Investigation, Internal Revenue Service, Office of Personnel Management, the North Carolina Attorney General, the Governor of North Carolina, members of Congress, watchdog organizations, and media

outlets (see Exhibit DD).

185.    At least **116 of these complaints were ignored entirely**, and **84 were deflected** with responses labeling the matter "civil only" or "outside our jurisdiction."

186.    Among these submissions were **IRS Form 3949-A Information Referrals** naming Webb, J. Vanover, and Klindera for suspected fraud and improper enrichment. Plaintiffs also filed twelve additional 3949-A forms against other officials implicated in misconduct (see Exhibit R, GG).

187.    The **North Carolina Attorney General's Office** responded to Plaintiffs' concerns by instructing them to "report it to the Sheriff."

188.    Shortly thereafter, the Attorney General's website was altered to **remove the misconduct reporting form** entirely (see Exhibit EE).

189.    The **Governor of North Carolina** ignored Plaintiffs' complaints.

190.    Later, the Governor's website was updated to include a **disclaimer** stating that allegations of misconduct by law enforcement were outside the Governor's jurisdiction (see Exhibit FF).

191.    Plaintiffs allege that these changes to official websites were not coincidental but part of a deliberate effort to foreclose avenues of accountability after Plaintiffs raised their concerns.

192.    Plaintiffs also contacted national and local media, including the **Cherokee Scout, Smoky Mountain News, and The Intercept**, seeking to expose the systemic corruption affecting Cherokee County citizens.

193.    Despite this extensive effort, no action was taken by authorities to investigate or correct the fraud, theft, and retaliation committed against Plaintiffs.

194.    Instead, each institution pointed to another, creating a **circular denial of responsibility** that mirrored the "closed loop" described in Section H.

195.    Plaintiffs allege that these responses show exhaustion of every available state and federal remedy and underscore the futility of further administrative pursuit.

196.    Plaintiffs therefore turn to this Court for relief, as it is the **only forum left** capable of addressing the widespread corruption and restoring their constitutional rights.

## M. Broader Pattern of Corruption in Cherokee County

197.    Plaintiffs' experiences are part of a broader pattern of corruption in Cherokee County where officials, neighbors, and institutions act together to fabricate narratives, retaliate against whistleblowers, and obstruct accountability.

198.    In December 2022, law enforcement officers — including Cherokee County deputies and Eastern Band of Cherokee Indians officers — stormed the home of **Jason and Alison Kloepfer** after fabricating a "**hostage situation.**"

199.    Kloepfer emerged from his home with his hands raised in compliance with orders. Despite this, he was shot multiple times by officers while surrendering.

200.    The supposed "hostage" narrative was later revealed to be false, yet it was used to justify the raid and to obscure accountability.

201.    In the civil-rights action that followed, Cherokee County and the Eastern Band of Cherokee Indians agreed to a **$10 million settlement** in 2025, confirming institutional culpability.

202.    In 2025, the District Attorney issued a **Giglio determination** deeming Defendant **Lt. Milton "Sport" Teasdale** untruthful regarding his involvement in the Kloepfer raid. Despite this finding, county leadership tolerated his continued role, showing deliberate indifference to officer misconduct.

203.    The same actors who fabricated and spread the false "hostage" story — including **Defendant Jacobs** and his ally **Defendant Morgan** — also fueled false narratives against Plaintiffs, accusing Vanover of "harassing Bob Lovingood" and other conduct that never occurred.

204.    Plaintiffs allege that **Morgan has a pattern of "making things up,"** from the Kloepfer hostage narrative to fabricated claims about Vanover, which were then adopted and weaponized by CCSO.

205.    Cherokee County has also faced scandal involving its **evidence room**, where firearms, cash, and other property went missing. Despite public outcry, accountability has been minimal and no systemic reforms were imposed.

206.    The County's Department of Social Services (DSS) has been implicated in the **unlawful removal of children from families**, with senior DSS leadership later convicted of **obstruction of justice** and related crimes for covering up their misconduct.

207.    These events mirror Plaintiffs' own experience: officials abuse their power, fabricate or ignore evidence, retaliate against those who challenge them, and obstruct accountability at every turn.

208. The **Clerk of Court's Office** has also been associated with record irregularities beyond Plaintiffs' case, including document mishandling and improper certifications, eroding the integrity of judicial proceedings countywide.

209. Together, these scandals confirm that the harms inflicted on Plaintiffs are not isolated grievances but part of a **widespread, systemic culture of corruption**.

210. In this culture, officials and their private allies feel emboldened to fabricate accusations, misuse legal process, and obstruct oversight, knowing that accountability will be blocked at every institutional checkpoint.

211. Plaintiffs allege that this environment enabled Webb, J. Vanover, Jacobs, Morgan, and others to act against them with impunity, confident that agencies like the DA's Office, SBI, DSS, and Clerk's Office would shield them rather than intervene.

212. The repeated use of false narratives — whether the fabricated "hostage" story in the Kloepfer case or false claims of harassment and trespass in Plaintiffs' case — reflects a **common playbook of lies, intimidation, and official protection.**

213. Plaintiffs present this broader context to show that their case is not an isolated dispute over property but a **predictable outcome of systemic corruption in Cherokee County**, where citizens who challenge wrongdoing are targeted, silenced, and dispossessed.

### N. Good-Faith Filing and Summary of Harm

214. Plaintiffs recognize this Court's duty under Rule 11 to guard against frivolous litigation.

215. This action is not brought for an improper purpose.

216. Each allegation in this Complaint is grounded in verified facts, sworn testimony, documentary evidence, photographs, recordings, or certified court records.

217. Plaintiffs submit this Complaint in good faith, with the understanding that perjury or fabrication would expose them to penalties, and with the confidence that the evidence they have preserved will withstand scrutiny.

218. Plaintiffs further allege that this action is necessary because every state and local remedy has been exhausted or deliberately obstructed, leaving this Court as the only forum capable of vindicating their rights.

219. The harms Plaintiffs have suffered are profound, ongoing, and cannot be dismissed as mere civil disputes.

220.   **Economic damages** include:

- $146,800 in uncompensated labor and improvements contributed by Vanover,

- More than $750,000 in personal property removed under false pretenses,

- Loss of insurance proceeds diverted by Webb,

- Loss of Yates's inheritance spent to complete the rebuild,

- $3,000 in legal fees defending against false trespass charges, and

- Loss of equity in a home later listed for $450,000.

221.   **Personal and property losses** include permanent exclusion from their own home, conversion of vehicles, tools, heirlooms, equipment, and the destruction of financial security and stability.

222.   **Reputational harm** includes Defendant Webb's false accusations that Plaintiffs were "doing meth and cocaine" and had "emptied the house," accusations intended to brand Plaintiffs as criminals and outcasts in their own community.

223.   **Psychological harm** includes the exacerbation of Vanover's diagnosed PTSD by intimidation tactics, wrongful confinement, and helplessness while their property was stripped, and Yates's trauma from repeated false arrests, homelessness, and displacement.

224.   Plaintiffs have endured humiliation, emotional distress, and the stigma of being treated as criminals rather than as victims of fraud and corruption.

225.   The harms are ongoing: Plaintiffs have never been permitted to return to their home, and Defendants Webb and J. Vanover continue to maintain possession of the property and belongings.

226.   Plaintiffs allege that the damages they have suffered flow directly from the coordinated actions and deliberate indifference of the Defendants named herein.

227.   Plaintiffs therefore respectfully invoke this Court's authority to declare their rights, to enjoin Defendants' ongoing misconduct, and to award compensatory and punitive damages as justice requires.


## Count I — False Arrest and Malicious Prosecution

*(42 U.S.C. § 1983 — Fourth and Fourteenth Amendments)*

**Against:** Defendants **Betty Webb**, **J. Vanover**, **Kenny Webb**, **Deputy Burrell**, **Deputy Dely**, **Lt. Mitch Morgan**, **Chief Deputy Justin Jacobs**, and **Sheriff Dustin Smith** (individual capacities).

228.    Plaintiffs incorporate by reference ¶¶1–227 as though fully set forth herein.

229.    On June 24, 2024, Defendant Webb obtained a trespass warrant against Plaintiff **Vanover**, alleging trespass "on or about May 20, 2024," despite knowing that Vanover was taken into federal custody on May 21, 2024 and never returned thereafter (see Exhibit E).

230.    Webb's accusation directly contradicted her own sworn testimony of July 31, 2023, in which she promised to return the property, and was made in bad faith on Vanover's birthday to inflict maximum harm.

231.    On July 11, 2024, Plaintiff **Yates** was lured to the Cherokee County Sheriff's Office under the pretense that she was being served with "civil papers." Instead, she was arrested for trespass by Defendant **Deputy Burrell.**

232.    On the same day, Defendant **Deputy Teasdale** told Yates she could not return to her property even with a deputy escort, showing the charges were being used to bar her access rather than to enforce legitimate law.

233.    On August 12, 2024, Yates was arrested again for trespass by Defendant **Deputy Dely**, based solely on a short, selective video clip provided by Defendant J. Vanover purporting to show Yates briefly stepping onto the property.

234.    Defendants **Jacobs** and **Morgan**, acting in supervisory capacities, ratified and permitted these arrests despite clear evidence that Plaintiffs were the lawful owners of the property by virtue of Yates's 2015 deed (see Exhibit A) and that Webb had no purchase contract or consideration for her claim of title.

234A. Plaintiffs further allege that private Defendants Webb, J. Vanover, and Kenny Webb acted jointly and in concert with CCSO officials, and thus under color of state law, in procuring the warrants and arrests described herein.

235.    Defendant **Sheriff Smith**, as final policymaker for CCSO, failed to intervene or correct these unconstitutional actions, despite being notified in writing by Plaintiffs.

236.    Both trespass prosecutions against Yates were dismissed in 2025 (see Exhibit C).

237.   The trespass prosecution against Vanover was also dismissed in 2025 (see Exhibit C).

238.   The dismissals constitute **favorable terminations** in Plaintiffs' favor, satisfying this element of malicious prosecution.

239.   These charges and arrests were instituted without probable cause, with malice, and for the improper purpose of dispossessing Plaintiffs of their home and property.

240.   As a direct and proximate result, Plaintiffs suffered the following injuries:

- **Yates:** two false arrests, homelessness for nearly two months, legal expenses of approximately $3,000, humiliation, reputational harm, and emotional distress.

- **Vanover:** baseless criminal prosecution, reputational harm, exacerbation of PTSD, and emotional distress from being accused of crimes he could not have committed while in custody.

- **Both Plaintiffs:** the loss of personal property exceeding $750,000, taken while Plaintiffs were excluded from their home under color of the false trespass charges.

241.   Defendants' actions deprived Plaintiffs of their rights under the **Fourth Amendment** (to be free from unlawful seizures) and the **Fourteenth Amendment** (to due process and equal protection).

## Relief Requested

242.   Plaintiffs request judgment against the above Defendants, jointly and severally, for:

- Compensatory damages in an amount to be determined at trial;

- Punitive damages against individual Defendants for their malicious conduct;

- Declaratory relief that the arrests and prosecutions violated Plaintiffs' constitutional rights;

- Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

- Any further relief the Court deems just and proper.

## Count II — First Amendment Retaliation

*(42 U.S.C. § 1983 — First and Fourteenth Amendments)*

**Against:** Defendants **Lt. Mitch Morgan**, **Chief Deputy Justin Jacobs**, **Sheriff Dustin Smith**, and **Theresa Creasman** (individual capacities).

243. Plaintiffs incorporate by reference ¶¶1–242 as though fully set forth herein.

244. The **First Amendment** protects Plaintiffs' rights to free speech, to petition the government for redress of grievances, and to access emergency services without retaliation.

245. From 2023 through 2025, Plaintiffs engaged in extensive protected activity by submitting more than 200 complaints and referrals to federal, state, and local authorities, including DOJ, FBI, IRS, SBI, the NC Attorney General, the Governor, Congress, watchdog organizations, and the press (see Exhibit DD).

246. Plaintiffs also exercised their rights to petition local authorities by repeatedly filing police reports, court filings, and correspondence exposing corruption by Webb, J. Vanover, and CCSO officials (see Exhibits M, S, and others cited herein).

247. In direct response to this protected activity, Defendants engaged in retaliatory actions designed to chill Plaintiffs' speech, punish them for speaking out, and deprive them of equal protection.

248. Defendant **Jacobs** wrote in an email that he was "**removing all hospitality from CCSO**" toward Plaintiffs, signaling a policy of retaliation for their complaints (see Exhibit S).

249. Defendant Jacobs also told Yates to "**hire a private attorney**" rather than expect assistance from CCSO, demonstrating official hostility to Plaintiffs' petitioning activity.

250. Defendant **Morgan** ratified the false trespass charges against Yates and Vanover, despite knowledge that Plaintiffs were lawful owners of the property and that Webb had no valid contract or entitlement.

251. Defendant **Smith**, as Sheriff and final policymaker for CCSO, permitted and ratified these retaliatory actions, despite being informed by Yates in writing of CCSO's refusals to protect Plaintiffs.

252. Defendant **Creasman**, acting as 911 Manager, threatened Vanover in a recorded call that if he continued to call 911 for protection, she would have him arrested (see Exhibit BB).

253. Defendant Creasman also interfered with Vanover's application to volunteer with the fire department, ensuring it was denied in further retaliation (see Exhibit CC).

254. These retaliatory acts were intended to silence Plaintiffs, to punish them for reporting corruption, and to facilitate Webb and J. Vanover's ongoing theft of Plaintiffs' property.

255. As a direct and proximate result, Plaintiffs suffered:

- **Suppression of speech and petition rights,** as Defendants' actions created fear of further arrests or retaliation for filing complaints;

- **Two false arrests of Yates** on trespass charges, directly tied to CCSO's hostility toward Plaintiffs' petitioning activity;

- **Homelessness and exclusion from their property,** inflicted as retaliation for speaking out;

- **Denial of emergency protection** through 911 threats;

- **Loss of property valued at more than $750,000,** taken while Plaintiffs were silenced and excluded; and

- **Psychological harm,** including trauma and exacerbation of Vanover's PTSD.

256. Defendants' conduct violated Plaintiffs' rights under the **First Amendment** to free speech and petition, as incorporated against state actors through the **Fourteenth Amendment.**


**Relief Requested**

257. Plaintiffs request judgment against the above Defendants, jointly and severally, for:

- Compensatory damages in an amount to be determined at trial;

- Punitive damages against individual Defendants for their retaliatory conduct;

- Declaratory relief that Defendants' conduct violated Plaintiffs' constitutional rights;

- Injunctive relief prohibiting further retaliation, including threats of arrest for lawful petitioning activity;

- Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

- Any further relief the Court deems just and proper.

## Count III — Deprivation of Property Without Due Process

*(42 U.S.C. § 1983 — Fourteenth Amendment)*

**Against:** Defendants **Lt. Mitch Morgan**, **Chief Deputy Justin Jacobs**, **Sheriff Dustin Smith**, and **Deputy Hunter Wood** (individual capacities).

258.   Plaintiffs incorporate by reference ¶¶1–257 as though fully set forth herein.

259.   The **Fourteenth Amendment** protects Plaintiffs from deprivation of property without due process of law.

260.   Plaintiffs lawfully owned the property at **301 Sunny Lane / 37 Shady Creek Ridge** by virtue of Yates's 2015 deed (see Exhibit A).

261.   From 2020 through 2025, Defendants Webb, J. Vanover, and Kenny Webb unlawfully entered the property, removed belongings, and converted assets exceeding **$750,000 in value** (see Exhibit P).

262.   While this was occurring, Plaintiffs repeatedly sought protection from the Cherokee County Sheriff's Office.

263.   Plaintiffs attempted to file **theft reports**, but deputies refused to take them or assign case numbers.

264.   Plaintiffs requested **deputy escorts** to safeguard their belongings while Yates was excluded and Vanover was in custody. These requests were denied.

265.   On July 11, 2024, Deputy **Sport Teasdale** told Yates she could not return to the property even with an escort, explicitly using the pending trespass charges to bar her.

266.   Yates documented this denial in a written statement submitted to both local and federal court and in contemporaneous emails to Sheriff **Dustin Smith** and Chief Deputy **Justin Jacobs** (see Exhibit M).

267.   In 2023, Defendant **Jacobs** sent an email to Plaintiffs stating that he was "**removing all hospitality from CCSO**" toward them (see Exhibit S). Plaintiffs allege this was an official directive evidencing hostility and bias.

268.   Around the same time, Defendant **Deputy Hunter Wood** told Plaintiff Yates in a phone call that Plaintiffs' property was considered "**abandoned**," reflecting CCSO's complicity in Webb and J. Vanover's unlawful seizure (see Exhibit T).

269.   Defendant **Morgan** ratified the false trespass charges and refusals, knowing Plaintiffs were being dispossessed without any lawful process.

270.     Defendant **Smith**, as final policymaker for CCSO, failed to intervene or provide protection despite being notified in writing of the thefts, refusals, and unlawful possession of Plaintiffs' property.

271.     These actions were not random errors by rogue deputies but reflected a deliberate policy and custom within CCSO to deny Plaintiffs protection and to aid Webb and J. Vanover in their unlawful possession.

272.     As a direct and proximate result, Plaintiffs lost possession of their home, belongings, inheritance, source of income, and equity, and have never been restored to their property.

273.     Plaintiffs allege that this deprivation occurred **without any due process of law**, in violation of the Fourteenth Amendment.

**Relief Requested**

Plaintiffs request judgment against the above Defendants, jointly and severally, for:

- Compensatory damages equal to the fair-market value of property wrongfully taken (exceeding $750,000), the value of labor and improvements ($146,800), inheritance spent, and other provable losses;

- Punitive damages against individual Defendants for deliberate indifference;

- Declaratory relief that Defendants' conduct deprived Plaintiffs of property without due process of law;

- Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

- Any further relief the Court deems just and proper.

## Count IV — Denial of Access to Courts

*(42 U.S.C. § 1983 — Fourteenth Amendment)*

**Against:** Defendants **Roger D. Gibson** and **Amanda A. Carroll** (individual capacities).

274.     Plaintiffs incorporate by reference ¶¶1–273 as though fully set forth herein.

275.     The **First and Fourteenth Amendments** protect Plaintiffs' right of access to the courts, including the right to present claims and defenses with a complete and accurate

record.

276.    Defendant **Gibson**, while serving as Clerk of Superior Court for Cherokee County, repeatedly returned Plaintiffs' filings **without file-stamping them** (see Exhibit W).

277.    These unstamped filings deprived Plaintiffs of an official record of their submissions, impairing their ability to prove claims, preserve issues for appeal, and demonstrate the timeline of events.

278.    Defendant **Carroll**, after succeeding Gibson, produced "certified" audio recordings of court proceedings that contained significant omissions.

279.    Most notably, the "certified" audio of the **July 31, 2023 no-contact hearing** was paused between **3:46:50 p.m. and 4:13:24 p.m.**, omitting the portion where Judge Wijewickrama disclosed his private meeting with Defendant Jacobs (see Exhibit F).

280.    The missing audio segment also erased the first part of Rhonda Lovingood's sworn testimony and the intimidation created by a courtroom filled with deputies, impairing Plaintiffs' ability to challenge the proceeding on appeal.

281.    Plaintiffs allege that Carroll's certification of the defective audio was not a mistake but a knowing act that further obstructed their access to justice.

282.    Without a complete and reliable record, Plaintiffs were unable to present or prove key issues in subsequent proceedings, including appeals and federal filings.

283.    Plaintiffs suffered concrete injury from these record irregularities, including:

- Inability to prove the **ex parte meeting** between Jacobs and Judge Wijewickrama;

- Inability to rely on **police reports and recordings** that were excluded or mischaracterized;

- Delay and prejudice in pursuing remedies at both the state and federal level.

284.    Defendants' conduct violated Plaintiffs' **constitutional right of access to the courts** under the First and Fourteenth Amendments.

**Relief Requested**

285.    Plaintiffs request judgment against the above Defendants, jointly and severally, for:

- Declaratory relief that Defendants' conduct violated Plaintiffs' right of access to the courts;

- Injunctive relief requiring that court records, filings, and recordings be preserved, corrected, and produced in full;

- Compensatory damages in an amount to be determined at trial;

- Punitive damages against individual Defendants for knowing obstruction of justice;

- Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

- Any further relief the Court deems just and proper.

## Count V — Conspiracy to Violate Civil Rights

*(42 U.S.C. § 1983 — Conspiracy to Deprive Plaintiffs of First, Fourth, and Fourteenth Amendment Rights)*

**Against:** Defendants **Betty Webb, J. Vanover, Kenny Webb, Robert Lovingood, Rhonda Lovingood, Zeyland McKinney, Lt. Mitch Morgan, Chief Deputy Justin Jacobs, Sheriff Dustin Smith**, and **Theresa Creasman** (individual capacities).

286.    Plaintiffs incorporate by reference ¶¶1–285 as though fully set forth herein.

287.    Section 1983 provides a cause of action against state actors, and private individuals acting in concert with them, who conspire to deprive persons of rights secured by the Constitution, including the First, Fourth, and Fourteenth Amendments.

288.    Beginning no later than 2019 and continuing through the present, Defendants Webb, J. Vanover, Kenny Webb, Robert Lovingood, and Rhonda Lovingood acted in agreement with CCSO officials to deprive Plaintiffs of their property, liberty, and equal protection.

289.    The conspiracy included the following overt acts:

- **Webb and J. Vanover's fraudulent procurement of the 2019 deed** under false pretenses while Yates was incarcerated (see Exhibit B);

- **Webb's arson admission** and proposal to stage a false break-in after the 2020 fire (see Exhibit I);

- **Jacobs's ex parte meeting** with Judge Wijewickrama immediately before the July 31, 2023 hearing, later omitted from the "certified" audio (see Exhibit F);

- **Webb's sworn testimony** on July 31, 2023 that she would return the property, contradicted by her later trespass accusations;

- **False sworn statements by Robert and Rhonda Lovingood,** submitted with their petition and entertained by the court, despite Plaintiffs' exculpatory police reports (see Exhibit M);

- **The double-digit number of deputies** filling the courtroom to intimidate Vanover, corroborated by a newspaper editor (see Exhibit N);

- **Jacobs's 2023 email** stating that he was "removing all hospitality" from CCSO toward Plaintiffs (see Exhibit S);

- **Hunter Wood's phone call** to Yates declaring that Plaintiffs' property was "abandoned" (see Exhibit T);

- **False trespass charges** against Vanover and Yates, initiated without probable cause (see Exhibits E and C);

- **Teasdale's July 11, 2024 directive** barring Yates from the property even with an escort (see Exhibit M);

- **Creasman's threat** to Vanover that further 911 calls would result in arrest, and her role in blocking his fire department application (see Exhibits BB and CC);

- **Attorney Zeyland McKinney's conduct,** including accusing Yates of illegal recording to intimidate her despite NC's one-party consent law, and telling third party Harley Kloepfer that Vanover was "crazy" while instructing him to reassure Plaintiffs "not to worry";

- **Probation Officer Jenny Whiteside's testimony** on the day Yates's federal charges were dismissed, which repeated Webb's attorney's May 21 "guests" phrasing, evidencing collusion with Webb.

290.    These actions were not isolated. They reflect a coordinated scheme by private actors and CCSO officials to dispossess Plaintiffs, silence their complaints, and retaliate against their protected activity.

291.    The object of the conspiracy was to strip Plaintiffs of their home, belongings, inheritance, and credibility while insulating Webb, J. Vanover, Jacobs, Smith, and their allies from accountability.

292.    As a direct and proximate result, Plaintiffs suffered:

- Loss of property valued over $750,000;

- Loss of equity and labor valued at $146,800;

- Loss of inheritance and insurance proceeds;

- Homelessness, displacement, and humiliation;

- False arrests and malicious prosecution;

- Retaliation for protected speech;

- Emotional distress and exacerbation of Vanover's PTSD.

293.    Defendants' agreement and overt acts violated Plaintiffs' rights under the **Fourth, First, and Fourteenth Amendments**, actionable under §1983.

**Relief Requested**

294.    Plaintiffs request judgment against the above Defendants, jointly and severally, for:

- Compensatory damages in an amount to be determined at trial;

- Punitive damages against individual Defendants for willful and malicious conduct;

- Declaratory relief that Defendants engaged in a conspiracy to deprive Plaintiffs of constitutional rights;

- Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

- Any further relief the Court deems just and proper.

## Count VI — Monell / Official-Capacity Liability

*(42 U.S.C. § 1983 — Policy, Custom, or Practice)*

**Against:** Defendant **Sheriff Dustin Smith**, in his official capacity as Sheriff of Cherokee County and final policymaker for the Cherokee County Sheriff's Office.

295.    Plaintiffs incorporate by reference ¶¶1–294 as though fully set forth herein.

296.    Section 1983 provides for liability against local governments and their policymakers when constitutional violations result from official policies, customs, or practices.

297.    At all relevant times, Defendant **Smith** was the elected Sheriff of Cherokee County and the final policymaker for the Cherokee County Sheriff's Office.

298.    The constitutional violations described herein — including false arrests, malicious prosecution, deprivation of property without due process, denial of access to the courts, and retaliation for protected speech — were the result of policies, customs, and practices maintained and tolerated by Sheriff Smith.

299.    These policies and customs included:

- Refusing to accept theft reports from Plaintiffs, thereby denying them equal protection of the laws;

- Denying deputy escorts to Plaintiffs, ensuring they could not protect their property while excluded;

- Ratifying false trespass charges brought without probable cause, for the purpose of excluding Plaintiffs from their home;

- Intimidating Plaintiffs in court with a disproportionate number of deputies;

- Directing hostility toward Plaintiffs, including **Chief Deputy Jacobs's 2023 email** stating he was "**removing all hospitality from CCSO**" toward Plaintiffs (see Exhibit S);

- **Issuing written directives "per Sheriff Smith,"** as reflected in **Lt. Mitch Morgan's emails** instructing subordinates in a manner hostile to Plaintiffs and consistent with the other customs alleged herein (see **Exhibit HH**);

- Deputies adopting Webb's false narrative, including **Deputy Hunter Wood's** statement to Yates that her property was "**abandoned**" (see Exhibit T);

- Using pending charges to bar Plaintiffs from their home, as shown by **Deputy Sport Teasdale's** July 11, 2024 directive refusing escort or reentry (see Exhibit M).

300.    The **"per Sheriff Smith" emails and directives** demonstrate that the Sheriff, as final policymaker, **initiated, authorized, or ratified** the customs described above, and that line officers acted pursuant to those directives, not by accident or isolated error (see Exhibit HH).

301.    These customs were so widespread, persistent, and entrenched that they constituted the functional policy of CCSO.

302.    Defendant Smith, as Sheriff, knew of and tolerated these customs. By failing to train, supervise, or discipline his subordinates, and by allowing directives to issue "per Sheriff

Smith," he ratified and endorsed their unconstitutional conduct.

303. These customs and failures were the moving force behind the constitutional deprivations suffered by Plaintiffs, including:

- False arrests and malicious prosecution;

- Loss of property valued at more than $750,000;

- Loss of labor and improvements valued at $146,800;

- Loss of inheritance and diverted insurance proceeds;

- Exclusion from their home and homelessness;

- Suppression of speech and retaliation for complaints;

- Emotional distress and exacerbation of Vanover's PTSD.

**Relief Requested**

304. Plaintiffs request judgment against Defendant Smith, in his official capacity, for:

- Declaratory relief that the customs and policies of CCSO were unconstitutional;

- Injunctive relief requiring the Sheriff's Office to adopt policies ensuring acceptance of reports, fair access to escorts, and preservation/production of records;

- Compensatory damages in an amount to be determined at trial;

- Costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

- Any further relief the Court deems just and proper.

## Count VII — Federal Officer Misconduct (Equitable Relief)

*(28 U.S.C. § 1331 — Declaratory and Injunctive Relief; Fifth Amendment Due Process)*

**Against:** Defendant **Jenny Whiteside** (individual capacity, acting under color of federal authority).

305. Plaintiffs incorporate by reference ¶¶1–304 as though fully set forth herein.

306. Plaintiffs allege that Defendant Whiteside, a United States Probation Officer, engaged in misconduct and collusion with private actors, including Webb, that deprived Plaintiffs of their rights to due process of law under the Fifth Amendment to the United States Constitution.

307. On the day Yates's federal charges were dismissed, Whiteside gave **false and hostile testimony** against Plaintiffs, repeating the same "**guests**" phrasing used in Webb's attorney's May 21, 2024 letter (see Exhibit U-1), evidencing coordination and collusion with Webb.

308. Plaintiffs had previously reported to Whiteside that Webb was attempting to extort them and steal their property. Instead of investigating or intervening, Whiteside aligned herself with Webb's narrative and used it against Plaintiffs.

309. Whiteside also threatened and berated Vanover during phone calls and in-person meetings, raising her voice and attempting to coerce him.

310. When Plaintiffs informed Whiteside that these conversations were recorded, she demanded to hear them. Once confronted with her own words, she ceased the threatening conduct, confirming her awareness of wrongdoing.

311. Plaintiffs preserved recordings of these calls and meetings. These recordings corroborate Whiteside's hostility, bias, and collusion.

312. On the day of Whiteside's false testimony, Yates notified Vanover's counsel and the prosecutor, and filed a **complaint with the FBI** concerning Whiteside's conduct (see Exhibit Y).

313. Plaintiffs submitted **preservation requests** to U.S. Probation to safeguard records of Whiteside's communications with Webb. These requests were ignored.

314. Plaintiffs also filed **FOIA requests**, which were denied on the basis that U.S. Probation is not subject to FOIA (see Exhibit X).

315. Plaintiffs allege that Whiteside's testimony and conduct were influenced by improper communications with Webb or Webb's attorney. Discovery will reveal emails, texts, and notes proving this collusion.

316. Whiteside's misconduct and coordination with Webb deprived Plaintiffs of due process, facilitated fraudulent trespass charges, and reinforced CCSO's unlawful exclusion of Plaintiffs from their property.

**Relief Requested**

317.     Plaintiffs request declaratory and injunctive relief against Defendant Whiteside, including:

- A declaration that Whiteside's conduct was unconstitutional and in violation of Plaintiffs' rights;

- An injunction requiring Whiteside to preserve and produce all communications with Webb and her representatives;

- An injunction prohibiting Whiteside from engaging in retaliation against Plaintiffs for pursuing this action.

318.     Plaintiffs further reserve the right to pursue damages against the United States under the **Federal Tort Claims Act (FTCA)** upon exhaustion of administrative remedies.

## Count VIII — Fraud / Fraudulent Inducement and Constructive Trust

*(North Carolina Common Law)*

**Against:** Defendants **Betty Webb** and **J. Vanover**.

319.     Plaintiffs incorporate by reference ¶¶1–318 as though fully set forth herein.

320.     Under North Carolina law, fraud and fraudulent inducement occur when a defendant knowingly makes false representations of material fact with intent to deceive, upon which the plaintiff reasonably relies to their detriment.

321.     Plaintiff Yates lawfully purchased the property at **301 Sunny Lane / 37 Shady Creek Ridge** in 2015 by valid contract with the Hamons and by recorded warranty deed (Book 1511, Pages 235–237, Instrument 01674) (see Exhibit A).

322.     There was never any purchase contract between Yates and Defendants Webb or J. Vanover.

323.     In August 2019, while Yates was incarcerated, Defendant Webb pressured her into signing a warranty deed transferring the property to Webb and J. Vanover.

324.     The 2019 deed recited only ten dollars ($10.00) in consideration and was recorded at Book 1619, Pages 881–883, Instrument 03515 (see Exhibit B).

325.     Yates's Power of Attorney did not authorize a transfer of real property, and Webb knew this.

326. Webb falsely represented to Yates that she was merely "adding Jennifer" to the deed so that insurance coverage would remain valid and squatters could be prevented.

327. Webb also promised that the property would be returned to Yates once she was released from incarceration.

328. These representations were false. Defendants Webb and J. Vanover never intended to return the property.

329. Webb made these false statements intentionally and with knowledge of their falsity, for the purpose of deceiving Yates into signing the deed.

330. The conversations in which Webb made these false representations occurred during phone calls recorded by federal prison facilities. Plaintiffs will subpoena these recordings, which will corroborate Webb's misrepresentations.

331. Yates reasonably relied on Webb's statements and signed the deed under duress, believing it was a temporary measure that would be corrected upon her release.

332. Defendants Webb and J. Vanover enriched themselves through this fraudulent transfer.

333. On July 31, 2023, Defendant Webb testified under oath that she would return the property to Plaintiffs. This testimony was corroborated by a text message from Defendant J. Vanover the same day (see Exhibit G).

334. Despite this sworn promise and corroborating message, Defendants Webb and J. Vanover maintained title in their own names.

335. In 2025, Defendant Webb listed the property for approximately **$450,000** on the Multiple Listing Service (MLS), further proving her intent to permanently deprive Plaintiffs of ownership (see Exhibit H).

336. Plaintiffs allege that Webb and J. Vanover obtained and maintained the deed to the property through fraud, fraudulent inducement, and false promises.

## Relief Requested

337. Plaintiffs request judgment against Defendants Webb and J. Vanover for:

- Rescission of the 2019 deed;

- Imposition of a **constructive trust** on the property in favor of Plaintiffs;

- Alternatively, an **equitable lien** for the value of Plaintiffs' interest in the property;

- Compensatory damages, including the value of lost equity, improvements, inheritance, and diverted insurance proceeds;

- Punitive damages for willful and malicious fraud;

- Costs and fees as allowed by law; and

- Any further relief the Court deems just and proper.

## Count IX — Conversion and Trespass to Chattels

*(North Carolina Common Law)*

**Against:** Defendants **Betty Webb**, **J. Vanover**, and **Kenny Webb**.

338.    Plaintiffs incorporate by reference ¶¶1–337 as though fully set forth herein.

339.    Under North Carolina law, conversion is the unauthorized exercise of ownership over another's property, depriving the rightful owner of possession. Trespass to chattels occurs when one unlawfully interferes with another's use or possession of personal property.

340.    From 2020 through 2025, Defendants Webb, J. Vanover, and Kenny Webb repeatedly entered Plaintiffs' property and removed their belongings under the false pretext of "abandonment."

341.    The property taken included, but was not limited to: vehicles, motorcycles, trailers, tractors, commercial equipment, tools, furniture, heirlooms, and personal effects.

342.    Among the items taken were the **tools and equipment that Plaintiff Vanover relied on for his livelihood**, depriving him not only of personal property but also of the means to support himself and his family.

343.    The aggregate fair-market value of the property taken exceeds **$750,000** (see Exhibit P).

344.    Plaintiffs possess **photographs and videos** documenting Defendant Kenny Webb's direct participation in the unlawful removal of their property (see Exhibit O).

345.    Defendant **Deputy Hunter Wood** told Plaintiff Yates in a phone call that Plaintiffs' property was considered "abandoned," reflecting CCSO's complicity in the theft and lending false legitimacy to Defendants' actions (see Exhibit T).

346. Plaintiffs made **demand for return** of their property through written communications, but Defendants refused or ignored such demands.

347. Defendants Webb, J. Vanover, and Kenny Webb wrongfully exercised dominion and control over Plaintiffs' property without legal justification, thereby depriving Plaintiffs of its use and value.

348. Plaintiffs allege that these actions were intentional, malicious, and part of a broader scheme to dispossess them while CCSO refused to provide protection.

349. As a direct and proximate result, Plaintiffs suffered:

- Loss of personal property exceeding $750,000;

- Loss of the tools and equipment Vanover used for his livelihood;

- Loss of irreplaceable heirlooms and personal effects;

- Humiliation, emotional distress, and reputational harm; and

- Continuing deprivation of their belongings, as Defendants maintain possession to this day.

**Relief Requested**

350. Plaintiffs request judgment against Defendants Webb, J. Vanover, and Kenny Webb for:

- Return of all property wrongfully taken;

- Alternatively, compensatory damages equal to the fair-market value of the property converted (exceeding $750,000);

- Special damages for loss of use of property and lost earning capacity tied to the stolen tools and equipment;

- Punitive damages for willful and malicious conduct;

- Costs and fees as allowed by law; and

- Any further relief the Court deems just and proper.

## Count X — Civil Conspiracy

*(North Carolina Common Law)*

**Against:** Defendants **Betty Webb**, **J. Vanover**, **Kenny Webb**, **Robert Lovingood**, **Rhonda Lovingood**, **Lt. Mitch Morgan**, **Chief Deputy Justin Jacobs**, **Deputy Hunter Wood**, **Attorney Zeyland McKinney**, and **Theresa Creasman**.

351.    Plaintiffs incorporate by reference ¶¶1–350 as though fully set forth herein.

352.    Under North Carolina law, a civil conspiracy exists where two or more persons agree to commit an unlawful act, or to commit a lawful act in an unlawful way, resulting in injury to another.

353.    The above-named Defendants acted in concert to dispossess Plaintiffs of their home and belongings, to silence them through intimidation and false charges, and to shield themselves and one another from accountability.

354.    In furtherance of this conspiracy, Defendants committed multiple overt acts, including but not limited to:

- Fraudulently procuring the 2019 deed from Yates while she was incarcerated (see Exhibit B);

- Burning Plaintiffs' home and proposing a staged break-in to fabricate police reports (see Exhibit I);

- Removing Plaintiffs' belongings, including the tools and equipment Vanover relied on for his livelihood, under the false pretense of "abandonment" (see Exhibits O, P, T);

- Filing and ratifying false trespass charges against Yates and Vanover, despite lack of probable cause (see Exhibits E, C);

- Using pending charges to bar Yates from her property, as shown by Teasdale's July 11, 2024 directive (see Exhibit M);

- Jacobs's ex parte meeting with Judge Wijewickrama, later omitted from the certified audio (see Exhibit F);

- Jacobs's 2023 email declaring he was "removing all hospitality" from CCSO toward Plaintiffs (see Exhibit S);

- **Wood's phone call** to Yates declaring Plaintiffs' property "abandoned" (see Exhibit T);

- False sworn statements by the Lovingoods, accusing Vanover of misconduct that never occurred (see Exhibit M);

- **McKinney's actions** at the July 31, 2023 hearing, including accusing Yates of unlawful wiretapping despite NC's one-party consent law, and spreading disparaging claims that Vanover was "crazy";

- Webb's August 2025 defamatory statements that Plaintiffs were "doing meth and cocaine" and had "emptied the house" (see Exhibit D);

- **Creasman's threat** to Vanover that further 911 calls would result in his arrest, and her interference in blocking his fire department application (see Exhibits BB, CC).

355.   These overt acts were undertaken pursuant to a common agreement, with knowledge of their falsity and illegality, and with the shared intent of depriving Plaintiffs of their property, credibility, and rights.

356.   As a direct and proximate result of this conspiracy, Plaintiffs suffered:

- Conversion of property exceeding $750,000;

- Loss of tools and equipment necessary for Vanover's livelihood;

- Homelessness and exclusion from their home;

- False arrests and malicious prosecution;

- Defamation and reputational harm;

- Emotional distress and exacerbation of Vanover's PTSD.


**Relief Requested**

357.   Plaintiffs request judgment against the above Defendants, jointly and severally, for:

- Compensatory damages in an amount to be determined at trial;

- Punitive damages for malicious and willful conspiracy;

- Declaratory relief that Defendants engaged in a civil conspiracy under North Carolina law;

- Costs and fees as allowed by law; and

- Any further relief the Court deems just and proper.

## Count XI — Defamation Per Se

*(North Carolina Common Law)*

**Against:** Defendant **Betty Webb**.

358. Plaintiffs incorporate by reference ¶¶1–357 as though fully set forth herein.

359. Under North Carolina law, defamation per se occurs when false statements are made that impute (1) the commission of a crime involving moral turpitude, (2) a contagious disease, (3) incompetence in one's profession, or (4) conduct incompatible with one's business, trade, or office.

360. In August 2025, Defendant Webb told members of the community that Plaintiffs were "**doing meth and cocaine**" and that they had "**emptied the house.**"

361. These statements were false. Plaintiffs have never engaged in the criminal conduct alleged.

362. These statements were malicious, made with knowledge of their falsity or reckless disregard for the truth.

363. Defendant Webb made these statements intending to destroy Plaintiffs' credibility, cast them as criminals, and justify the unlawful seizure of their property.

364. Defendant Webb's statements imputed the commission of indictable drug crimes involving moral turpitude. Under North Carolina law, such accusations constitute **defamation per se**.

365. Defendant **Russelene Richmond** provided a sworn declaration confirming that Webb made these statements in the community (see Exhibit D).

366. Because these statements are defamatory per se, damages are presumed. Plaintiffs also suffered specific harm, including reputational damage, humiliation, and emotional distress.

367. As a direct and proximate result, Plaintiffs have been further stigmatized, excluded from their community, and left without the credibility needed to challenge corruption locally.

## Relief Requested

368. Plaintiffs request judgment against Defendant Webb for:

- Compensatory damages, including general and special damages for reputational harm, humiliation, and emotional distress;

- Presumed damages for defamation per se;

- Punitive damages for willful and malicious conduct;

- Costs and fees as allowed by law; and

- Any further relief the Court deems just and proper.

### Count XII — Malicious Prosecution

*(North Carolina Common Law)*

**Against:** Defendants **Betty Webb**, **J. Vanover**, **Lt. Mitch Morgan**, **Sheriff Dustin Smith** and **Chief Deputy Justin Jacobs**.

369. Plaintiffs incorporate by reference ¶¶1–368 as though fully set forth herein.

370. Under North Carolina law, malicious prosecution occurs when (1) a defendant initiates or procures a criminal proceeding against another, (2) without probable cause, (3) with malice, and (4) the proceeding terminates in the plaintiff's favor.

371. On June 24, 2024, Defendant **Betty Webb** initiated trespass prosecutions against both Plaintiffs by obtaining warrants alleging trespass "on or about May 20, 2024" (see Exhibit E).

372. These allegations were impossible, as Vanover was taken into federal custody on May 21, 2024 and never returned thereafter.

373. On July 11, 2024, Plaintiff **Yates** was arrested on the June 24 warrant after being lured to the Cherokee County Sheriff's Office under the false pretense that she was receiving "civil papers." During this arrest, Yates suffered a **panic attack** as a result of the stress and intimidation.

374. On August 12, 2024, Yates was arrested again for trespass pursuant to another warrant bearing **Betty Webb's name.** The warrant was based on a short, selective video clip that Webb, on information and belief, provided to law enforcement.

375. Defendants Jacobs, Morgan, and Sheriff Smith ratified these prosecutions despite knowledge of Plaintiffs' lawful ownership of the property (see Exhibit A) and despite Webb's lack of any purchase contract or consideration for title.

376. Neither prosecution was supported by probable cause. Both were undertaken with malice and for the improper purpose of excluding Plaintiffs from their home while Webb and J. Vanover stripped their belongings.

377. In 2025, both trespass prosecutions against Yates and the trespass prosecution against Vanover were dismissed in Plaintiffs' favor (see Exhibit C).

378. These dismissals constitute **favorable terminations** under North Carolina law.

379. As a direct and proximate result of these malicious prosecutions, Plaintiffs suffered:

- **Yates:** two false arrests, a panic attack during her July 11 arrest, homelessness for nearly two months, legal expenses of approximately $3,000, humiliation, reputational harm, and emotional distress;

- **Vanover:** baseless prosecution on an impossible charge, reputational harm, emotional distress, and exacerbation of PTSD;

- **Both Plaintiffs:** loss of property exceeding $750,000, taken while prosecutions were pending and used as leverage to dispossess them.

## Relief Requested

380. Plaintiffs request judgment against Defendants Webb, J. Vanover, Jacobs, Smith and Morgan, jointly and severally, for:

- Compensatory damages in an amount to be determined at trial;

- Punitive damages for willful and malicious prosecution;

- Costs and fees as allowed by law;

- Any further relief the Court deems just and proper.

## Count XIII — Abuse of Process

*(North Carolina Common Law)*

**Against:** Defendants **Betty Webb**, **J. Vanover**, **Robert Lovingood**, **Rhonda Lovingood**, **Chief Deputy Justin Jacobs**, **Lt. Mitch Morgan**, and **Deputy Sport Teasdale**.

381. Plaintiffs incorporate by reference ¶¶1–380 as though fully set forth herein.

382.    Under North Carolina law, abuse of process occurs when a party uses legal process for an ulterior purpose, after the process has been issued, in a manner not proper in the regular conduct of the proceeding.

383.    On July 28, 2023, Defendants Robert and Rhonda Lovingood filed a no-contact petition against Vanover supported by **false sworn statements**, including allegations "on information and belief" that he cursed at a magistrate — statements later disproven by recordings and paramedic records (see Exhibits L, M).

384.    On July 31, 2023, the Lovingoods' petition was heard. Defendant **Jacobs** met privately with Judge Wijewickrama immediately before the hearing. That ex parte meeting, later omitted from the "certified" audio, corrupted the proceeding (see Exhibit F).

385.    During the same hearing, Defendant **Betty Webb aligned herself with Kevin and testified under oath that she would transfer the property back to Plaintiffs.** This sworn promise directly contradicts Webb's later reliance on trespass charges to exclude Plaintiffs, making her subsequent misuse of process particularly egregious. Defendant **Jennifer Vanover was not present at the hearing.**

386.    Jacobs later confirmed CCSO's official hostility by sending an email in 2023 that he was "**removing all hospitality from CCSO**" toward Plaintiffs (see Exhibit S).

387.    Defendant **Morgan** ratified the CCSO's refusals to protect Plaintiffs and directed deputies, "per Sheriff Smith," to deny protection, thereby furthering the misuse of legal process against them.

388.    On June 24, 2024, Defendant Webb procured trespass warrants against both Plaintiffs, leveraging the Lovingoods' earlier petition and CCSO hostility to escalate the exclusion (see Exhibit E).

389.    On July 11, 2024, Plaintiff Yates was arrested under the June 24 warrant after being lured to the Sheriff's Office under false pretenses. Defendant **Deputy Sport Teasdale** then told her she could not return to the property, even with an escort.

390.    Defendants used the no-contact and trespass proceedings not for their legitimate purposes but as tools to bar Plaintiffs from their home, facilitate Webb and J. Vanover's removal of property worth more than $750,000, and retaliate against Plaintiffs for speaking out.

391.    As a direct and proximate result of this abuse of process, Plaintiffs suffered:

- Loss of their home and belongings;

- Loss of tools and equipment necessary for Vanover's livelihood;

- Conversion of property exceeding $750,000;

- Homelessness, humiliation, and emotional distress; and

- Exacerbation of Vanover's PTSD.

**Relief Requested**

Plaintiffs request judgment against the above Defendants, jointly and severally, for:

- Compensatory damages in an amount to be determined at trial;

- Punitive damages for willful and malicious abuse of process;

- Costs and fees as allowed by law;

- Any further relief the Court deems just and proper.

## Count XIV — Unjust Enrichment / Quantum Meruit

*(North Carolina Common Law)*

**Against:** Defendants **Betty Webb** and **J. Vanover**.

392.    Plaintiffs incorporate by reference ¶¶1–391 as though fully set forth herein.

393.    Under North Carolina law, unjust enrichment occurs when one party confers a benefit on another, which is knowingly accepted, and it would be inequitable for the recipient to retain the benefit without payment. Quantum meruit provides restitution for the reasonable value of services rendered where no compensation has been made.

394.    After the January 2020 fire, Plaintiffs were forced to rebuild the residence at **301 Sunny Lane / 37 Shady Creek Ridge**, despite Webb and J. Vanover holding title by fraudulent deed.

395.    From November 2020 onward, Plaintiff **Kevin-Wayne Vanover** demolished the fire-damaged remains and rebuilt the home largely by himself.

396.    Vanover provided extensive skilled labor, including carpentry, structural work, demolition, and general contracting, supplemented by licensed subcontractors for electrical and plumbing services.

397. The fair-market value of Vanover's labor and improvements is approximately **$146,800** (see Exhibit K).

398. Plaintiffs also contributed materials, labor, and personal funds toward the rebuild.

399. Because Webb diverted and retained much of the insurance proceeds, Plaintiffs were forced to use **Yates's inheritance** to complete the rebuild.

400. Plaintiffs performed this work and expense in reliance on Webb's sworn promise that the property would be transferred back, and in the good-faith belief that they were restoring their own home.

401. Vanover was not paid for this labor. Webb and J. Vanover knowingly accepted the benefits of the rebuild without providing compensation.

402. In 2025, Webb listed the rebuilt property for approximately **$450,000** on the Multiple Listing Service (MLS), demonstrating her intent to profit from Plaintiffs' uncompensated labor and investment (see Exhibit H).

403. Plaintiffs allege that it would be inequitable to allow Webb and J. Vanover to retain the value of these improvements and labor without restitution.

**Relief Requested**

404. Plaintiffs request judgment against Webb and J. Vanover, jointly and severally, for:

- Restitution in the amount of the fair-market value of Vanover's labor ($146,800);

- Restitution for Plaintiffs' inheritance and materials spent to complete the rebuild;

- Imposition of a **constructive trust** or **equitable lien** on the property for the value of Plaintiffs' contributions;

- Compensatory damages for unjust enrichment;

- Punitive damages for fraudulent and malicious conduct;

- Costs and fees as allowed by law; and

- Any further relief the Court deems just and proper.

## Count XV — Breach of Oral Contract / Promissory Estoppel

*(North Carolina Common Law)*

**Against:** Defendants **Betty Webb** and **J. Vanover**.

405. Plaintiffs incorporate by reference ¶¶1–404 as though fully set forth herein.

406. On July 31, 2023, during a no-contact order hearing, Defendant **Betty Webb** testified under oath that she would **transfer the property back to Plaintiffs.**

407. That same day, Defendant **J. Vanover** sent a text message corroborating Webb's sworn promise (see Exhibit G).

408. This oral promise, made in open court and confirmed in writing, created a binding obligation under North Carolina law.

409. Plaintiffs relied on this promise in continuing to labor, invest, and maintain hope that their home would be restored to them.

410. Plaintiffs' reliance included:

- Allowing Webb and J. Vanover to retain title temporarily, despite the fraudulent 2019 deed;

- Investing inheritance and labor into improvements to the property;

- Continuing to safeguard records and pursue remedies rather than abandoning their rights.

411. Defendants Webb and J. Vanover breached this oral promise by failing to transfer the property back, and instead, by 2025, listing the property for approximately **$450,000** (see Exhibit H).

412. Plaintiffs' reliance was foreseeable, reasonable, and detrimental.

413. Plaintiffs allege that Defendants Webb and J. Vanover's conduct constitutes a **breach of oral contract** and, alternatively, that under the doctrine of **promissory estoppel,** they are estopped from denying their sworn and written promise to return the property.

**Relief Requested**

414. Plaintiffs request judgment against Defendants Webb and J. Vanover, jointly and severally, for:

- Specific performance requiring transfer of the property back to Plaintiffs;

- Alternatively, damages in an amount equal to Plaintiffs' lost equity, inheritance, and improvements;

- Imposition of a constructive trust or equitable lien to enforce Defendants' promise;

- Punitive damages for willful and malicious breach;

- Costs and fees as allowed by law; and

- Any further relief the Court deems just and proper.

## Count XVI — Breach of Oral Contract / Promissory Estoppel (Klindera)

*(North Carolina Common Law)*

**Against:** Defendant **Kim Klindera**.

415. Plaintiffs incorporate by reference ¶¶1–414 as though fully set forth herein.

416. In 2020–2021, Plaintiff Yates entered into a **verbal storage agreement** with Defendant Klindera. Under this agreement, Klindera permitted Plaintiffs to store their boat and trailer, dump trailer, and commercial mower on her property, with the understanding that she would safeguard these items from being taken by Defendant Webb.

417. Plaintiffs had already provided Klindera with extensive unpaid labor, including mowing, carpentry, automotive and mechanical work, hauling, and moving, and relied on her as a trusted neighbor in entering the storage agreement.

418. Plaintiffs fully performed under this agreement by placing their property with Klindera for safekeeping.

419. Defendant Klindera breached this oral agreement by permitting Webb to take Plaintiffs' stored property without notice or consent.

420. Plaintiffs sent Klindera a **formal letter** demanding return of the property, and later an **invoice** for its value. Klindera ignored both communications (see Exhibit Q).

421. Plaintiffs reasonably relied on Klindera's promise to safeguard their property and suffered detriment when she breached.

422. As a direct and proximate result of Klindera's breach, Plaintiffs lost property of significant value, including commercial equipment and tools necessary for Vanover's livelihood.

423. Plaintiffs allege that under **promissory estoppel**, Klindera is estopped from denying her obligation to safeguard the property she accepted.

**Relief Requested**

424. Plaintiffs request judgment against Defendant Klindera for:

- Compensatory damages equal to the value of the property taken;

- Special damages for the loss of use of property and loss of livelihood tied to the stolen tools and equipment;

- Punitive damages for willful and malicious conduct;

- Costs and fees as allowed by law; and

- Any further relief the Court deems just and proper.

## Count XVII — Intentional Infliction of Emotional Distress

*(North Carolina Common Law)*

**Against:** Defendants **Betty Webb, J. Vanover, Kenny Webb, Robert Lovingood, Rhonda Lovingood, Lt. Mitch Morgan, Chief Deputy Justin Jacobs, Sheriff Dustin Smith, Deputy Sport Teasdale, Deputy Hunter Wood, Attorney Zeyland McKinney, Theresa Creasman,** and **Probation Officer Jenny Whiteside.**

425. Plaintiffs incorporate by reference ¶¶1–424 as though fully set forth herein.

426. Under North Carolina law, intentional infliction of emotional distress requires (1) extreme and outrageous conduct, (2) intended to cause severe emotional distress or done with reckless indifference, and (3) resulting in severe emotional distress.

427. Defendants engaged in a coordinated course of conduct that was extreme, outrageous, and beyond the bounds of decency in a civilized society.

428. Defendants' conduct included:

- **Fraudulently inducing** Yates to sign a 2019 deed under duress while incarcerated (see Exhibit B);

- **Burning the home** and proposing a staged break-in to file a false police report (see Exhibit I);

- **Seizing $750,000+ worth of property**, including the tools and equipment Vanover needed for his livelihood, under the false pretense of "abandonment" (see Exhibits O, P, T);

- **Kenny Webb's direct participation** in removing and hauling away Plaintiffs' belongings, documented in photographs and video (see Exhibit O);

- **Filing false sworn statements** in the Lovingoods' July 2023 petition, used to launch an ex parte-corrupted hearing (see Exhibits L, M, F);

- **Jacobs's ex parte meeting** with Judge Wijewickrama, omitted from the certified audio (see Exhibit F);

- **Jacobs's 2023 "removing all hospitality" email** confirming CCSO's hostility (see Exhibit S);

- **Morgan's directives "per Sheriff Smith"** ratifying CCSO's refusals and misuse of process;

- **Webb's sworn promise on July 31, 2023** to transfer the property back, directly contradicted by her later trespass accusations;

- **False trespass prosecutions**, arrests without probable cause, and Yates's panic attack during her July 11, 2024 arrest (see Exhibits E, C, M);

- **Teasdale's July 11, 2024 directive** barring Yates from reentering even with escort (see Exhibit M);

- **Wood's phone call** declaring Plaintiffs' property "abandoned" (see Exhibit T);

- **McKinney's intimidation** at the July 31, 2023 hearing, falsely accusing Yates of unlawful recording, and disparaging Vanover to third parties;

- **Creasman's threat** to Vanover that further 911 calls would result in arrest, and her interference in blocking his fire department application (see Exhibits BB, CC);

- **Webb's August 2025 defamation** accusing Plaintiffs of "doing meth and cocaine" and "emptying the house" (see Exhibit D);

- **Whiteside's false testimony** on the day Yates's federal charges were dismissed, repeating Webb's "guests" phrasing, her threats and berating of Vanover, and her collusion with Webb despite knowing Plaintiffs had reported Webb's extortion.

429.    These acts were not isolated incidents but a coordinated and malicious pattern of harassment, retaliation, intimidation, and deceit.

430.    Defendants knew or should have known that their conduct would cause Plaintiffs severe emotional distress, and they acted with malice or reckless indifference to Plaintiffs' suffering.

431.    As a direct and proximate result, Plaintiffs suffered severe emotional distress, including:

- **Yates:** trauma from two false arrests, homelessness, humiliation, reputational damage, and the stress of being targeted by systemic corruption;

- **Vanover:** exacerbation of diagnosed PTSD due to intimidation in court, wrongful confinement, and helplessness while his property and livelihood were stripped away;

- **Both Plaintiffs:** ongoing fear, humiliation, anxiety, and emotional pain from being excluded from their home and defamed in their community.

432.    Plaintiffs allege that Defendants' conduct was extreme, outrageous, intentional, and malicious, satisfying the elements of intentional infliction of emotional distress.


**Relief Requested**

433.    Plaintiffs request judgment against the above Defendants, jointly and severally, for:

- Compensatory damages for emotional distress, humiliation, reputational harm, and related losses;

- Punitive damages against individual Defendants for extreme and outrageous conduct;

- Costs and fees as allowed by law;

- Any further relief the Court deems just and proper.

## Count XVIII — Conspiracy to Obstruct Justice and Intimidate Witnesses

*(42 U.S.C. § 1985(2))*

**Against:** Defendants **Betty Webb**, **J. Vanover**, **Kenny Webb**, **Robert Lovingood**, **Rhonda Lovingood**, **Lt. Mitch Morgan**, **Chief Deputy Justin Jacobs**, **Sheriff Dustin Smith**, **Deputy Sport Teasdale**, **Deputy Hunter Wood**, **Attorney Zeyland McKinney**, **Theresa Creasman**, **Probation Officer Jenny Whiteside**, **Clerk Amanda Carroll**, and **Clerk Roger Gibson**.

434. Plaintiffs incorporate by reference ¶¶1–433 as though fully set forth herein.

435. Section 1985(2) provides a cause of action against persons who conspire to obstruct the due course of justice in federal or state court by deterring, intimidating, or injuring parties or witnesses in their participation in judicial proceedings. Plaintiffs allege that the above-named Defendants entered into such a conspiracy to obstruct justice and to intimidate Plaintiffs as parties and witnesses.

436. Beginning in 2019 and continuing through 2025, the above-named Defendants agreed and conspired to obstruct justice and intimidate Plaintiffs as witnesses and parties in judicial proceedings.

437. The conspiracy included, but was not limited to, the following acts:

- **Robert and Rhonda Lovingood's false sworn statements** in their July 2023 no-contact petition, designed to trigger a tainted proceeding (see Exhibits L, M);

- **Jacobs's ex parte meeting** with Judge Wijewickrama before the July 31, 2023 hearing, later erased from the certified audio (see Exhibit F);

- **McKinney's intimidation** of Yates at the hearing, falsely accusing her of unlawful recording, and disparaging Vanover as "crazy" to third parties;

- **Betty Webb's sworn promise in court** to return the property, contradicted by her later trespass accusations (see Exhibit G);

- **Whiteside's false testimony** on the day Yates's federal charges were dismissed, repeating Webb's "guests" phrasing from the May 21, 2024 letter and reinforcing the narrative against Plaintiffs;

- **Teasdale's July 11, 2024 directive** barring Yates from her own property even with escort (see Exhibit M);

- **Wood's phone call** telling Yates that her property was "abandoned" (see Exhibit T);

- **Creasman's threat** to Vanover that further 911 calls would result in arrest, and her interference in blocking his fire department application (see Exhibits BB, CC);

- **Carroll's certification of the July 31, 2023 hearing audio** with a 26-minute omission, eliminating disclosure of Jacobs's ex parte meeting (see Exhibit F);

- **Gibson's return of Plaintiffs' filings unstamped**, blocking their ability to prove claims and preserve appeals (see Exhibit W);

- **Filing and pursuing trespass charges** against Yates and Vanover, despite knowing they were baseless (see Exhibits E, C);

- **Coordinated removal of Plaintiffs' belongings** valued at over $750,000 while charges were pending, preventing Plaintiffs from presenting or preserving evidence (see Exhibits O, P).

438.  These acts were undertaken with the shared intent to:

- Deter and intimidate Plaintiffs from presenting evidence in state and federal proceedings;

- Obstruct the due course of justice in Cherokee County by ensuring Plaintiffs could not defend themselves or assert their rights;

- Retaliate against Plaintiffs for petitioning government agencies and courts for redress.

439.  As a direct and proximate result, Plaintiffs suffered:

- Loss of property exceeding $750,000;

- Exclusion from their home and livelihood;

- False arrests, malicious prosecution, and fabricated evidence;

- Emotional distress, humiliation, and exacerbation of Vanover's PTSD;

- Impairment of their ability to seek justice through courts and agencies.

**Relief Requested**

440.  Plaintiffs request judgment against the above Defendants, jointly and severally, for:

- Compensatory damages in an amount to be determined at trial;

- Punitive damages for willful conspiracy to obstruct justice and intimidate witnesses;

- Declaratory relief that Defendants violated 42 U.S.C. § 1985(2);

- Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

- Any further relief the Court deems just and proper.

## Count XIX — Neglect to Prevent Conspiracy
(42 U.S.C. § 1986)

**Against:** Sheriff Dustin Smith; District Attorney Ashley Welch; Chief Assistant District Attorney Thomas J. Arnold; Clerk Amanda Carroll; and U.S. Probation Officer Jenny Whiteside (individual capacities).

441.    Plaintiffs incorporate by reference ¶¶1–440 as though fully set forth herein.

442.    Section 1986 provides a cause of action against any person who, having knowledge of a § 1985 conspiracy, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses to do so.

443.    Plaintiffs allege that the above Defendants had knowledge of the conspiracies described herein and the means to prevent or remedy them. Instead, these Defendants deliberately refused to intervene.

444.    By failing to act, despite knowledge and authority, these Defendants allowed the conspiracy to proceed, resulting in Plaintiffs' false arrests, property deprivations, exclusion from their home, reputational harm, and emotional distress.

## Relief Requested

445.    Plaintiffs request judgment against the above Defendants, jointly and severally, for:
- Compensatory damages in an amount to be determined at trial;
- Punitive damages for willful neglect of duty;
- Costs and fees as allowed by law; and
- Any further relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Meredith-Ann Yates and Kevin-Wayne Vanover respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, and grant the following relief:

1. **Declaratory Relief**
   ○ A declaration that Defendants' actions, policies, and conspiracies, as described herein, violated Plaintiffs' rights under the Constitution and laws of the United States and North Carolina;
   ○ A declaration that the 2019 deed to Webb and J. Vanover was fraudulently obtained and is voidable;
   ○ A declaration that Defendants Webb and J. Vanover hold the property at 301 Sunny Lane / 37 Shady Creek Ridge in constructive trust for Plaintiffs.

2. **Injunctive Relief**
   ○ An injunction restoring Plaintiffs to possession of their home and belongings;
   ○ An injunction prohibiting Defendants from further retaliation, harassment, or defamation against Plaintiffs;
   ○ An injunction requiring Defendants, including Sheriff Smith in his official capacity, to implement policies ensuring acceptance of reports, availability of escorts, and preservation and production of records;
   ○ An injunction requiring Defendant Whiteside to preserve and produce all communications with Webb and prohibiting further retaliation.

3. **Rescission and Equitable Remedies**
   ○ Rescission of the 2019 deed transferring the property to Webb and J. Vanover;
   ○ Imposition of a constructive trust or equitable lien on the property for the value of Plaintiffs' contributions, labor, inheritance, and equity.

4. **Compensatory Damages** in an amount to be determined at trial, including but not limited to:
   ○ The value of personal property wrongfully taken (exceeding $750,000);
   ○ The fair-market value of Vanover's uncompensated labor and improvements ($146,800);
   ○ Yates's inheritance diverted to rebuild the home;
   ○ Insurance proceeds wrongfully diverted by Webb;
   ○ Legal expenses of approximately $3,000;
   ○ Loss of use of property, tools, and equipment tied to Vanover's livelihood;
   ○ Emotional distress, humiliation, reputational harm, and trauma, including exacerbation of Vanover's PTSD and Yates's panic attacks.

5. **Punitive Damages** against all individual-capacity Defendants for willful, malicious, and outrageous conduct, in an amount sufficient to punish and deter.

6. **Attorneys' Fees and Costs** pursuant to 42 U.S.C. § 1988 and other applicable law.

7. **Such Other Relief** as the Court deems just and proper.

**Final Clause:**

Plaintiffs further request that this Court grant relief for violations of their rights under the Fifth and Fourteenth Amendments to the United States Constitution, and under 42 U.S.C. §§ 1983, 1985, and 1986.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

### Respectfully submitted,

Dated: _Sept. 29_ , 2025

/s/ Meredith-Ann Yates
Meredith-Ann Yates
Plaintiff, Pro Se
P.O. Box 528
Marble, NC 28905
Phone: 828-361-7245
Email: mimivano22@gmail.com

/s/ Kevin-Wayne Vanover
Kevin-Wayne Vanover
Plaintiff, Pro Se
P.O. Box 528
Marble, NC 28905
Phone: 828-361-7245
Email: kwvanover22@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on this _29_ day of _September_, 2025, I mailed the foregoing Complaint, with Exhibit List and attached Exhibits, to the Clerk of Court for the United States District Court for the Western District of North Carolina, Asheville Division, for filing.

Because this is the initial pleading, service will be effected by the Clerk through issuance of summonses in accordance with Rule 4 of the Federal Rules of Civil Procedure.

Respectfully submitted,

/s/ Meredith-Ann Yates
Meredith-Ann Yates
Plaintiff, Pro Se
P.O. Box 528
Marble, NC 28905
Phone: (828) 361-7245
Email: mimivano22@gmail.com

/s/ Kevin-Wayne Vanover
Kevin-Wayne Vanover
Plaintiff, Pro Se
P.O. Box 528
Marble, NC 28905
Phone: (828) 361-7245
Email: kwvanover22@gmail.com

**EXHIBIT LIST**

*(Filed with Complaint, WDNC Asheville Division)*

**Foundational Exhibits (Attached)**

Exhibit A – Warranty Deed to Meredith-Ann Yates (Book 1511, Pages 235–237, Instrument 01674, April 22, 2015) – establishes original ownership.

Exhibit B – Warranty Deed to Betty Webb and Jennifer Vanover (August 2019, Book 1619, Pages 881–883, Instrument 03515) – fraudulent transfer for $10 consideration, obtained under duress.

Exhibit C – Dismissal Orders, State v. Yates and State v. Vanover trespass cases (2025) – favorable termination element of false arrest and malicious prosecution claims.

Exhibit D – Sworn Declaration of Russelene Richmond (August 10, 2025) – publication of false criminal accusations; defamation per se.

Exhibit E – Warrants against Kevin Vanover and Meredith Yates (June 24, 2024, alleging trespass "on/about May 20, 2024") – impossible date while Vanover was already in federal custody; shows lack of probable cause.

Exhibit F – Screenshot of certified court audio (No-Contact Order Hearing, July 31, 2023), showing 26-minute gap (3:46:50–4:13:24). Transcript pending – tampered record; basis of access-to-courts claim.

**Additional Exhibits (On File / To Be Supplemented)**

Exhibit G – Jennifer Vanover text message corroborating Webb's sworn promise (July 31, 2023). On file.

Exhibit H – 2025 MLS listing showing property advertised for $450,000. On file.

Exhibit I – Insurance and Fire Department assessments of January 2020 fire. On file.

Exhibit J – Recorded prison phone calls with Betty Webb re: property removal and staging

break-in. On file.

Exhibit K – Construction receipts, invoices, and valuation of $146,800 in improvements by Kevin Vanover. On file.

Exhibit L – Plaintiffs' recording of magistrate panic attack (July 2023) and paramedic run report. On file.

Exhibit M – Plaintiffs' police reports and July 30, 2023 transmittal emails to court/McKinney, showing exculpatory evidence. On file.

Exhibit N – Statement of local newspaper editor re: unusual deputy presence (July 31, 2023). On file.

Exhibit O – Photos and videos of Kenny Webb removing Plaintiffs' property. On file.

Exhibit P – Verified Inventory of Withheld, Destroyed, or Stolen Property and Valuation of Labor/Improvements. On file.

Exhibit Q – Demand and invoice letters to Defendant Klindera. On file.

Exhibit R – IRS Form 3949-A submissions re: Webb, J. Vanover, and Klindera. On file.

Exhibit S – Email from Chief Deputy Jacobs (2023) stating "removing all hospitality from CCSO." On file.

Exhibit T – Deputy Hunter Wood's phone call to Yates declaring property "abandoned." On file.

Exhibit U – ADA Arnold letter/email (August 20, 2025) stating matter is "civil only." On file.

**Exhibit U-1 – Attorney letter dated May 21, 2024 (describing Plaintiffs as "guests"). On file.**

Exhibit V – SBI Flowers email (August 18, 2025) stating SBI acts only on referrals. On file.

Exhibit W – Returned, unstamped filings from Clerk Gibson's office. On file.

Exhibit X – FOIA denial letters (U.S. Probation not agency). On file.

Exhibit Y – FBI complaint filed by Plaintiffs re: Probation Officer Whiteside. On file.

Exhibit Z – Recordings of Whiteside threats and yelling; transcript excerpts pending. On file.

Exhibit AA – ATF testimony confirming §922(o) item was a non-functional "paperweight." On

file.

Exhibit BB – Audio recording of 911 Manager Creasman threatening arrest if Vanover continued to call 911. On file.

Exhibit CC – Documentation of denial of Vanover's fire department application. On file.

Exhibit DD – Log of 200+ complaints submitted to DOJ, FBI, IRS, SBI, AG, Governor, Congress, watchdogs, and media. On file.

Exhibit EE – Screenshot of NC Attorney General website before and after removal of misconduct reporting form. On file.

Exhibit FF – Screenshot of Governor's website disclaimer added after Plaintiffs' complaint. On file.

Exhibit GG – Twelve additional IRS Form 3949-A filings re: other officials. On file.

Exhibit HH – Emails from Lt. Morgan stating directives issued "per Sheriff Smith." On file.

**Reservation of Rights:** Plaintiffs reserve the right to supplement this exhibit list with additional materials, transcripts, and certified records as they become available, or as directed by the Court.

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

ASHEVILLE DIVISION

MEREDITH-ANN YATES and KEVIN-WAYNE VANOVER, Plaintiffs

v.

See Complaint for full list of Defendants, Defendants

Case No. _____

EXHIBIT A

Warranty Deed to Meredith-Ann Yates (Book 1511, Pages 235–237, Instrument 01674, April 22, 2015)

FILED  May 04, 2015    10:48:14 am    FILED
BOOK   01511                           CHEROKEE
PAGE   0235 THRU 0237                  COUNTY NC
INSTRUMENT #  01674                    DAPHNE DOCKERY
RECORDING      $26.00                  REGISTER
EXCISE TAX     $158.00                 OF DEEDS

**CHEROKEE COUNTY TAX CERTIFICATION**
There are no delinquent taxes due that are a lien
against the Parcel Numbers(s) set forth in this deed.
Cherokee County Tax Collector
Date: _5/04/2015_ By: _cp_

# *WARRANTY DEED*

### DEED STAMPS:    $158.00

This instrument was prepared by David E. Cowan of the law firm of Cowan & Cowan, P.A.  Title to the lands and/or interest in lands described herein is not certified unless a separate, written title opinion has been given to, or title insurance obtained for, the Grantees herein by said law firm.

Based upon information furnished by the Grantor(s) or their agents, the accuracy of which is not guaranteed by Cowan & Cowan, P.A., the mailing address of the Grantors is as stated after their name, and the property described in this deed [] includes [X] does not include, the primary residence of a Grantor.

Pin Number:  551300739861000 & 551300830538000

# State of North Carolina
# County Of Cherokee

Title File No. 15-216

**This Indenture** made the **22nd** day of **April, 2015**, by and between:

> **JAMES G. HAMON and wife, JOYCE G. HAMON, and JAMES G. HAMON and JOYCE G. HAMON, Trustees of the James G. Hamon and Joyce G. Hamon Revocable Living Trust dated January 10, 2002**
> **28 Leeward Drive**
> **Placida, FL 33946**

hereinafter called Grantors, and

> **MEREDITH A. YATES**
> **PO Box 361**
> **Robbinsville, NC 28771**

hereinafter called Grantees, (said designations shall include the respective parties, whether one or more, individual or corporate, and their respective successors in interest or assigns).

**Witnesseth;** That the Grantors, for and in consideration of the sum of Ten Dollars, and other good and valuable considerations to them in hand paid by the Grantees, the receipt whereof is hereby acknowledged, have and by these presents do give, grant, bargain, sell, convey and confirm unto the Grantees, their heirs and/or successors and assigns, (subject to the terms, conditions, covenants, restrictions, exceptions and reservations hereinafter stated) the following particularly described real estate, located in Cherokee County, North Carolina to-wit:

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

ASHEVILLE DIVISION


MEREDITH-ANN YATES and KEVIN-WAYNE VANOVER, Plaintiffs

v.

See Complaint for full list of Defendants, Defendants


Case No. _____


EXHIBIT B



Warranty Deed to Betty Webb and Jennifer Vanover (August 2019, Book 1619, Pages 881–883, Instrument 03515)

1619
0881

FILED  Aug 01, 2019   02:58:44 pm   FILED
BOOK   01619                         CHEROKEE
PAGE   0881 THRU 0883                COUNTY NC
INSTRUMENT #  03515                  DAPHNE DOCKERY
RECORDING     $26.00                 REGISTER
EXCISE TAX    (None)                 OF DEEDS  DD

**CHEROKEE COUNTY TAX CERTIFICATION**
There are no delinquent taxes due that are a lien
against the Parcel Numbers(s) set forth in this deed.
Cherokee County Tax Collector
Date: __8-1-19__  By: __dt__

# WARRANTY DEED

DEED STAMPS: $ _____
PIN No.: 551300739861000; 551300830538000

This instrument was prepared by R. Scott Lindsay, The Lindsay Law Firm, PLLC, 84 Valley River Avenue, Murphy, NC 28906. Telephone: 828-837-2921. Fax: 828-837-2707 Title to the lands and/or interest in lands described herein is not certified unless a separate, written title opinion has been given to, or title insurance obtained for, the Grantees herein by said law firm.

Based upon information furnished by the Grantor(s) or their agents, the accuracy of which is not guaranteed by The Lindsay Law Firm, PLLC, the mailing address of the Grantor(s) is as stated after their name, and the property described in this deed [ ] includes {X} does not include, the primary residence of a Grantor.

## State of North Carolina
## County Of Cherokee

**This Indenture,** made the 10th day of May, 2018 by and between:

**MEREDITH A. YATES, unmarried**
c/o Betty Webb
110 Ithaca Lane
Oak Ridge, Tennessee 37830

hereinafter called Grantors, and

**JENNIFER VANOVER and BETTY WEBB,**
as joint tenants with the right of survivorship, and specifically not as tenants in common,
110 Ithaca Lane
Oak Ridge, Tennessee 37830

hereinafter called Grantees, (said designations shall include the respective parties, whether one or more, individual or corporate, and their respective successors in interest or assigns).

**Witnesseth;** That the Grantor, for and in consideration of the sum of Ten Dollars and other valuable considerations to her in hand paid by the Grantees, receipt of which is hereby acknowledged, has·given, granted, bargained, sold and conveyed, and by these presents does give, grant, bargain, sell, convey and confirm unto the Grantees, as joint tenants with right of survivorship, and specifically not as tenants in common, their successors and assigns, subject to any conditions, restrictions, reservations, exceptions or limitations which may hereinafter appear, the following particularly described real estate located in Cherokee County, North Carolina, to-wit:

Tract One: 2.62 Acre, portion of Tract No. 13A
All that certain tract of land, containing 2.62 acres, more or less, known as a portion of Tract No. 13A of Sunny/Slope Subdivision, Murphy Township, Cherokee County, North Carolina, and being more particularly described according to a plat of survey prepared by True Line Surveying Co., Charles V. Bryson, R.L.S. L-3182, dated June 4, 1998, and from said plat of survey being more particularly described as follows:

BEGINNING at an iron rod found in the centerline of a road, said iron rod found being in a line common with the Arthur G. Hamon property, Deed Book 514, page 86; thence with the centerline of said road and with a line common to Hamon the following courses and distances: South 11-00-55 East 62.87 feet, South 16-00-21 East 27.94 feet, South 30-19-21 East 15.51 feet, South 35-36-21 East 37.95 feet, South 52-01-45 East 42.53 feet, South 67-31-16 East 18.19 feet, South 52-37-15 East 41.86 feet, South 37-53-02 East 23.48

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

ASHEVILLE DIVISION


MEREDITH-ANN YATES and KEVIN-WAYNE VANOVER, Plaintiffs

v.

See Complaint for full list of Defendants, Defendants


Case No. _____


EXHIBIT D


Sworn Declaration of Russelene Richmond (August 10, 2025)

Witness Declaration of Russelene Richmond
c/o 776 Poor House Mountain Trail
Murphy NC 28906

To Whom It May Concern:

I, Russelene Richmond, make this sworn declaration in connection with the ongoing criminal complaint of Meredith-Ann: Yates regarding the theft of her personal property by Betty Webb and Jennifer Vanover.

I am a resident of Cherokee County and have known Meredith for five years. Among the property in dispute is a violin that originally belonged to my grandmother, which Meredith had in her possession prior to the loss of her home and property.

On or about mid July, I contacted Betty Webb by phone to inquire about the whereabouts of my grandmother's violin. During this call, Betty Webb told me that Kevin and Meredith "were doing meth and cocaine" and that they had "emptied out the house" before she regained possession of it.

These statements were unsolicited, unrelated to my question about the violin, and were presented as factual. I have personal knowledge that these claims are false, and I understood them to be intended to damage Meredith and Kevin's reputation within the community.

I affirm that Betty Webb did not provide the violin or any accounting for it during this conversation.

I make this declaration voluntarily and affirm under penalty of perjury that the statements herein are true and correct to the best of my knowledge and belief.

Executed this ___10__ day of _August___, 2025.

/s/ Russelene Richmond

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

ASHEVILLE DIVISION


MEREDITH-ANN YATES and KEVIN-WAYNE VANOVER, Plaintiffs

v.

See Complaint for full list of Defendants, Defendants


Case No. _____




EXHIBIT E




Warrants against Kevin Vanover and Meredith Yates (June 24, 2024,
alleging trespass 'on/about May 20, 2024')

| File No. | | |
|---|---|---|
| 24CR341776-190 | Law Enforcement Case No. | LID No. |

**WARRANT FOR ARREST**

**THE STATE OF NORTH CAROLINA VS.**

Name And Address Of Defendant
MEREDITH ANN YATES
301 SUNNY LN

MARBLE        NC        28905
CHEROKEE COUNTY

# STATE OF NORTH CAROLINA

CHEROKEE County

In The General Court Of Justice
District Court Division

| Race | Sex | Date Of Birth | Age |
|---|---|---|---|
| W | F | 09/06/1974 | 49 |

Name Of Defendant's Employer

Date Of Offense
05/20/2024

☐ Misdemeanor Offense Which Requires Fingerprinting Per Fingerprint Plan

Date Of Arrest & Check Digit No. (as shown on fingerprint card)

Complainant Name (and address, if Complainant is an officer)
BETTY WEBB

Witness Information

**OFFENSE(S)** (see AOC-CR-100 Continuation(s) for charging text)

| Count No. | Offense | Offense in Violation Of G.S. | Offense Code |
|---|---|---|---|
| 1 | M - SECOND DEGREE TRESPASS | 14-159.13 | 5709 |

**TO ANY OFFICER WITH AUTHORITY AND JURISDICTION TO EXECUTE A WARRANT FOR ARREST FOR THE OFFENSE(S) CHARGED IN THIS WARRANT:**
I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully, and feloniously did commit the offense(s) set forth above and on the attached AOC-CR-100 Continuation(s), which is (are) incorporated by reference. This act(s) was in violation of the law referred to in this Warrant For Arrest. This Warrant For Arrest is issued upon information furnished under oath by the complainant listed. You are DIRECTED to arrest the defendant and bring the defendant before a judicial official without unnecessary delay to answer the charge(s) above.

| Date Issued | Name Of Issuing Official | Signature | |
|---|---|---|---|
| 06/24/2024 | Allen Denny | | ☒ Magistrate ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court ☐ District Court Judge ☐ Superior Court Judge |

| Location Of Court | Court Date | Court Time |
|---|---|---|

**WAIVER OF PROBABLE CAUSE HEARING**

The undersigned defendant, with the consent of his/her attorney, waives the right to a probable cause hearing.

| Date Waived | Signature Of Defendant | Name Of Attorney | Signature Of Attorney |
|---|---|---|---|

AOC-CR-100, Rev. 3/23, © 2023 Administrative Office of the Courts

Defendant

| STATE VERSUS | CHEROKEE County | File No. 24CR341773-190 |
|---|---|---|

**Name Of Defendant**
KEVIN WAYNE VANOVER

**Date Of Issuance Of Warrant For Arrest**
06/24/2024

**NOTE:** *Use this page to set forth the charging text for each offense listed on the AOC-CR-100. G.S. 15A-924(a)(5).*

**Count 1.**   **Offense:** M - SECOND DEGREE TRESPASS

*Charging Text For This Count*
On or about the date of offense shown and in the county named above the defendant unlawfully and willfully did without authorization enter and remain on the premises of BETTY WEBB , located at 301 SUNNY LN , after having been notified not to enter and remain there by the owner of the premises, a person in charge of the premises, a lawful occupant of the premises, or another authorized person, BETTY WEBB .

**Count 2.**   **Offense:**

*Charging Text For This Count*

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

ASHEVILLE DIVISION


MEREDITH-ANN YATES and KEVIN-WAYNE VANOVER, Plaintiffs

v.

See Complaint for full list of Defendants, Defendants


Case No. _____


EXHIBIT F


Screenshot of certified court audio (No-Contact Order Hearing, July 31, 2023), showing 26-minute gap (3:46:50–4:13:24). Transcript pending

